

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### AP-75,363

### MAX ALEXANDER SOFFAR, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL
### FROM CAUSE NO. 319724 IN THE 232ND DISTRICT COURT
### HARRIS COUNTY

**Per curiam. PRICE, J., concurred on point of error four and otherwise joined. KEASLER, J., filed a concurring opinion in which HERVEY, J., joined.**

### O P I N I O N

In 1981, a jury convicted Max Alexander Soffar of capital murder. The trial judge sentenced him to death, in accordance with the jury's answers to the special issues. We affirmed his conviction and sentence on direct appeal[1] and denied his initial application for a writ of habeas corpus.

---

[1] *Soffar v. State*, 742 S.W.2d 371 (Tex. Crim. App. 1987), *cert. denied,* 493 U.S. 900 (1989).

Soffar then filed a federal petition for a writ of habeas corpus. Ultimately, in 2004, concluding that Soffar was denied effective assistance of counsel at trial, the United States Court of Appeals for the Fifth Circuit remanded the case to the district court for entry of an order setting aside Soffar's conviction and sentence.[2]

In February 2006, Soffar was retried. A jury convicted him of capital murder,[3] and based on the jury's answers to the special issues, the trial judge sentenced Soffar to death.[4]

Soffar now appeals his conviction and sentence.[5] After reviewing Soffar's thirty-three points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment.

**Facts**

Soffar was convicted of capital murder and sentenced to death for participating in the robbery and execution-style killing of three people at the Fairlanes Bowling Alley in Houston on the night of July 13, 1980. The Fairlanes Bowling Alley was located near the intersection of Windfern Road and Northwest Freeway (U.S. Highway 290). Tommy Temple, Steve Sims, and Greg Garner, employees at the bowling alley, and Arden Alane Felsher, Temple's girlfriend, were shot by Soffar and Latt Bloomfield. Garner survived, despite being shot in

---

[2] *Soffar v. Dretke,* 368 F.3d 441 (5th Cir. 2004).

[3] T EX. PENAL CODE ANN. § 19.03(a).

[4] T EX. CODE CRIM. PROC. ANN. 37.071 § 2(g).

[5] *Id.* at § 2(h).

the head.

Two unidentified individuals broke into the bowling alley on July 13th shortly after it closed. They gained entry by breaking a glass door on the side of the building and stole several items from the vending machines. Because the door could not be repaired on the 13th, Jim Peters, the general manager, asked Temple, Sims, and Garner to stay at the bowling alley until the cleaning crew was scheduled to arrive at 4:00 a.m. the next morning.

Garner called his mother, Nellie, at 12:08 a.m. on July 14th. He told her, "[S]omeone is here and I need help." She asked him what was wrong, and he said, "[T]hey just left." He said something in a "garbled" voice that sounded like, "[S]omebody hit me with a fish." Nellie heard a phone ringing in the background, and Garner put her on hold. When Garner got back on the line, Nellie asked him if he was bleeding. He responded, "[Y]es mom the side of my face and I'm holding my eyeball." Nellie then sent her husband, Ira, to the bowling alley, and she followed shortly thereafter.

Peters called the bowling alley at approximately 12:15 a.m. Garner answered the phone after a few rings. According to Peters, Garner's voice was garbled, and it was hard to understand him. Peters asked Garner if everything was all right, and Garner said, "either, "'[H]e" or "'[T]hey made me lay down' or 'made us lay down.'" Peters called the police and immediately drove to the bowling alley.

Ira arrived at the bowling alley first. He parked directly in front of the entrance doors and brightened his headlights. He saw Garner raise his head, and he observed someone else

lying on the floor next to him. Ira went inside and saw Garner, a female, and two males lying on their stomachs. They were positioned parallel to the front door, with their heads toward the snack bar, and their feet toward the control booth. Garner was closest to the door, followed by Felsher, Sims, and Temple. All had been shot in the head. Felsher was "gasping for breath," and Sims and Temple were dead. Ira tried to use the phone at the bowling alley but he "couldn't get an outside line," so he went to a church across the street and asked someone there to call the police. He went back to the bowling alley and asked Garner if the people that shot him were white or black. Garner replied, "White."

Nellie and Peters arrived at the bowling alley, followed by the police and the paramedics. The paramedics unsuccessfully tried to save Felsher's life and sent Garner to Hermann Hospital via Life Flight. A police officer found Sims's wallet in the parking lot. Felsher's purse was on the counter of the control booth, along with a white plastic jug. Peters discovered that approximately $1,000 in cash had been taken from the control center register. He observed that the "folding bills" were taken, but not the coins. He further observed that the cash drawers for the snack bar and the alcohol bar were in the office, and the office door was closed and locked.

None of the latent fingerprints lifted from the front door and counter area led to a suspect. Latent-print examiner Leonard Cooper testified that he did not dust the white plastic jug for prints because it had a rough surface, and he "didn't feel that it would develop a print." Peters testified that, by 3:00 or 3:30 a.m., the police had left and the victims had been

removed from the scene.  The cleaning crew arrived at 4:00 a.m. and cleaned the entire bowling alley.  When police asked Peters about the white plastic jug, he told them that he did not know what had happened to it.  Detective M.F. Kardatzke testified that he determined that the white plastic jug had been emptied and washed.

Each of the victims suffered one gunshot wound to the head.  Felsher had an entry wound on her right cheek and an exit wound on the back of her head.  Sims had an entry wound on the back left portion of his head and an exit wound on his left cheek.  Sims also had several shallow abrasions on his chest, and a small bullet fragment was recovered just beneath his skin in that area.  Temple was shot in his left temple, and the bullet lodged in his right ear canal.  Felsher, Sims, and Temple died from their gunshot wounds.  Garner had an entry wound above his left ear and an exit wound below his left eye.  He lost his eye and suffered severe brain trauma.

When crime-scene investigator D.M. Rushing processed the scene on July 14th, he found one fired bullet under Felsher, a second fired bullet under Sims or close to him, and several bullet fragments under or around Sims.  When Officer Ted Thomas later went to the bowling alley on July 23rd, he discovered four bullet holes in the carpet, a third fired bullet in the padding of the carpeting, and a "divot" in the concrete floor beneath the carpet pad.  Thomas also found a bullet fragment in the "divot" and another bullet fragment "right at the same location . . . on the back of the carpet, as the carpet was rolled back."  Firearms examiner Charlie Anderson determined that the bullets were lead and that they were .38 or

.357 caliber, but he was unable to determine "the exact manufacturer and exact configuration of them."

On July 15th, truck driver Andrew Davis found two wallets on the inbound side of Northwest Freeway near the bowling alley. He gave them to Houston police officer R.O. Olive and showed him the location where he found them. Olive searched the area and found two credit cards that belonged to Ira Garner.

After being life-flighted to the hospital, Garner underwent brain surgery and remained in the hospital for several weeks. Dr. Phillip Leon Gildenberg, the neurosurgeon who treated Garner, testified that Garner suffered "quite a severe trauma to the brain" and that his injury had the potential to affect his memory. Gildenberg observed that Garner was "still having problems with thinking and with memory" several weeks after his injury. Gildenberg had Garner examined by a neuropsychologist, who determined that Garner's "memory quotient" was "quite low."

Police interviewed Garner about the offense while he was recovering in the hospital. In his first interview, on July 17th, three days after having surgery, Garner described the lone assailant as a "20 foot" tall black man. He said that the man came to the front door after the bowling alley closed and that Sims opened the door for him. The man asked for some water and was carrying a white plastic container. The man then went outside and came back in with a gun. He wanted the money out of the register and made everyone lie down on the floor. After the man got the money, he shot them. Garner stated that he was the third one

shot.

Garner added more details in his interview on July 18th. This time he said that the assailant was white, around 25 years old, and had "weird" hair. Garner stated that he parked his car at the church across the street before the incident occurred, that he was bowling on lanes 25 and 26 when the man came to the door with a pitcher, that Sims walked outside with the man, that the man had a gun on Sims when they came back inside, that the man carried a gun with a round barrel in his right hand, that the man took the victims' wallets, and that none of the victims said anything or tried to run. Garner "passed out" when the man shot him; he got up and used the telephone after he awoke. He remembered speaking to his mother and Peters on the telephone. Garner also worked with police to sketch a diagram of the crime scene which depicted Felsher lying closest to the door, followed by Sims, Garner, and Temple.

Garner repeated this story to police on July 19th; however, he said that he did not know if the assailant was carrying anything to hold the water he requested. He again described the assailant as white and a little taller and bigger than himself. He also said that his gun was about six to eight inches long. He said that he walked up to the front when Sims and the man came back inside. The man first asked Garner to get the money out of the cash register, and Garner replied that he did not know how to do so. The man called Felsher and Temple up to the front. He made them lie face down on the floor and put their hands above their heads. No one said anything or screamed. Sims got up to get the money out of the

register and then laid back down on the floor. The man then said, "[G]oodbye," and shot them. Garner heard four shots and passed out. He woke up, used the telephone, and went over to Felsher, and then passed out again. He stated that he laid back down on the floor in a different spot after using the telephone.

On July 20th, Garner told police that the assailant was white, 25 to 30 years' old, a little bit over six feet tall, weighed over 155 pounds, had combed-back hair that was darker than blonde, and had no facial hair. This time, Garner stated that the man was "finding some air for his tires," and he did not remember anything about the man requesting water.

Garner also assisted police in creating a composite sketch of the suspect on July 30th. The police distributed copies of the composite along with a description of the suspect to the news media. The description of the suspect stated that he was a white male, twenty-five to thirty years old, six feet, two inches, 175 to 185 pounds, had no facial hair, had long brown or dark brown hair over his ears that was combed back, and that he held the gun in his right hand. Fairlanes offered a $10,000 reward in conjunction with the case, and someone later added $5,000 to it.

Detective Kardatzke interviewed Garner again after he was released from the hospital. On the morning of August 5th, Garner assisted a portrait artist in creating another drawing of the suspect.

Garner testified at trial, twenty-six years after the offense. He testified that he planned to stay late at the bowling alley on the night of the offense because someone had broken in

the previous night. He parked his car at the church across the street before the bowling alley closed at 11:30 p.m. He was bowling when he noticed Sims talking to a man by the control-booth counter. He did not recall how the man entered the bowling alley. He bowled a few more frames, and then he walked over to Sims and the man to see what they were talking about. When he got near them, he saw the man pointing a gun at Sims. The man asked Garner if he knew how to open the register, and Garner replied, "No, I do not." The man told Garner to lie down and asked if anyone else was in the building. Either Sims or the man called Felsher and Temple to come over from the bar area. The man asked for their wallets; Garner held his in the air, and the man grabbed it. Next, he heard "two or three" gunshots and passed out. After he awoke, he remained still for ten to fifteen seconds to make sure the man was gone. When he got up to use the telephone, he had to move Sims because Sims was lying on his leg. Garner used the telephone in the control booth and called his mother. While he was talking to his mother, Peters called on the other line. Garner put his mother on hold and spoke to Peters. He did not remember what they talked about and did not remember talking to his mother again after ending his conversation with Peters. He remembered seeing headlights come up to the front door and his father walking into the bowling alley. The next thing he remembered was waking up in the hospital.

Garner testified that the assailant was white, in his mid-twenties, about the same height as Garner (5' 11"), with a medium build and dark hair that was at least to his shoulders. Garner did not remember whether he had any facial hair. He testified that the

assailant held the gun in his right hand.

Officer Raymond Willoughby stopped Soffar for speeding on a motorcycle in League City shortly after 8:00 a.m. on August 5, 1980. Soffar told Willoughby that his name was Mark Scott. In his offense report, Willoughby stated that Soffar was 6' 1", 160 pounds, with brown hair, a moustache, and a beard. Willoughby spoke to the dispatcher and discovered that the motorcycle had been reported stolen. He asked the dispatcher to send backup, ascertained Soffar's real name, placed him under arrest, and read him his *Miranda* rights.[6] He asked Soffar to empty his pockets, which contained "quite a few pieces of jewelry, coins, papers," and what Willoughby believed to be a small amount of marijuana. Soffar told Willoughby that he obtained the jewelry from a burglary he committed. Willoughby placed Soffar in handcuffs and put him in the back of his patrol car.

Detective Jim Palmire from the Friendswood Police Department arrived and spoke to Soffar for a few minutes while he was seated in the back of the patrol car. Palmire testified that he sat in the front seat and read Soffar his *Miranda* warnings at 8:23 a.m. Soffar told Palmire that "he wasn't going to no penitentiary over a stolen motorcycle" and "[t]o check Houston for bigger things." When Palmire asked Soffar what he was talking about, Soffar did not respond. Palmire testified that he did not ask him any other questions.

Willoughby testified that Soffar made several spontaneous statements while being transported to the League City Police Department. Soffar said that he had been "giving some

---

[6] *Miranda v. Arizona,* 384 U.S. 436 (1966).

information" to Sergeant Bruce Clawson with the Galveston County Sheriff's Department. Willoughby understood that to mean that Soffar was an informant. Soffar said that "if he was going to go to prison it would not be for a motorcycle theft it would be for something bigger." He stated that "he had information about the bowling alley murders that had occurred in Houston a few weeks before." He also said he wanted to talk to Sergeant Clawson. When they arrived at the police department, Willoughby told Lieutenant Steve Johnson that Soffar said that he knew about the bowling-alley murders and that Soffar wanted to talk to Clawson. Clawson arrived shortly thereafter and accompanied Soffar, Johnson, and Willoughby to a magistrate's office at about 10:00 a.m. They returned to the police department after Soffar received his statutory warnings from the magistrate.

Assistant District Attorney Terry Wilson arrived at the police department around noon and spoke with Soffar. Wilson recorded their conversation on a tape recorder that he kept in his pocket. When asked if Soffar knew the conversation was recorded, Wilson testified, "Not as far as I know he did not." Wilson testified that he read Soffar his *Miranda* warnings before speaking with him. Soffar told Wilson that he and his friend, Latt Bloomfield, broke into the bowling alley the night before the murders. Soffar gained entry by kicking in a side window. They returned the next night because Bloomfield wanted to rob the bowling alley. Soffar parked outside by the front doors in Bloomfield's brown Thunderbird after the bowling alley closed. Bloomfield went inside with his gun, which was a blue ".38" or ".357" with a three-inch barrel. Soffar saw the people inside lie down on the ground. He then heard

two or three shots, then Bloomfield ran outside, and they drove away. Bloomfield told him that he shot the people because "somebody moved in the back" and "it scared him." They obtained between $500 and $700 in small bills from the robbery and bought drugs on Scott Street afterward.

Soffar gave his first written statement to Detective Gil Schultz shortly after 2:00 p.m. Prior to taking Soffar's statement, Shultz knew that two other people had admitted burglarizing the bowling alley the night before the murders and had been arrested for that offense. In his first written statement, Soffar recited basically the same story that he told Wilson. However, he clarified that he "heard about five shots altogether" and that they bought "about $380.00 in drugs" afterwards. He added that Bloomfield robbed a "U-Totem" convenience store in Galveston after they bought drugs. Soffar was transported from the League City Police Department to the Houston Police Department later that day.

On the morning of August 6th, Detective Kenny Williamson questioned Soffar in a tape-recorded interview. Soffar maintained that Bloomfield committed the robbery while he waited outside in the car. During the interview, Williamson drew a diagram of the bowling alley and the parking lot. Soffar noted on the diagram such details as the position of the car in the parking lot, the location of the lanes, the counter, the snack bar, and the people inside the bowling alley. After their interview, Soffar was placed in a lineup while Bloomfield was placed in another. Garner viewed both lineups but was unable to positively identify his assailant. When he viewed Soffar's lineup, Garner told Detective Kardatzke that "it would

look like three or four." Soffar was the number three participant in the lineup.

On the afternoon of August 6th, Soffar gave his second written statement to Detective James Ladd. He again maintained that Bloomfield committed the robbery while he waited outside in the car. He added that Bloomfield had pulled a woman's stocking over his hair before going into the bowling alley to rob it and that the man they later bought drugs from was called "Pops" or "Pop." He further stated: "I was back over at Pops a few weeks ago and told him about this deal at the bowling alley. I asked him if he had heard about it and that Latt and I had done it. He thought that we were just kidding."

Ladd testified that, in the afternoon, he and Williamson left the police department with Soffar so that Soffar could "point out some of the locations that he had been talking about." The detectives first drove Soffar to the Bunker Hill location of the Fairlanes Bowling Alley, located just south of I-10. Ladd testified that they wanted to "let [Soffar] comment on the location . . . since [they] were not at the location where the murders had happened but a different bowling alley all together [sic]." Ladd testified that when they pulled into the parking lot, Soffar looked around and said that it did not look like the right place. They then drove to the Windfern location, where the offense had occurred. Ladd testified that Soffar said that it "looked right." Soffar then showed the detectives where he and Bloomfield bought drugs after the robbery. Soffar pointed out Lawrence Bryant, whose nickname was "Papa," and Williamson spoke to Bryant and Bryant's girlfriend, Mable Cass. Finally, Soffar showed the detectives the U-Totem convenience store that Bloomfield allegedly robbed.

Ladd later ascertained that Bloomfield had not robbed the store. The detectives returned Soffar to jail around 11:00 p.m.

The next day, August 7th, Soffar asked to speak with Ladd and Williamson again. Williamson testified that Soffar was upset because Bloomfield had been released while he was being charged. That evening, Soffar signed his third written statement. Ladd testified that, before making his written statement, Soffar said that he had not broken into the bowling alley the night before the instant offense. In his third statement Soffar stated:

> My name is Max Soffar. I have been in jail since Tuesday morning for this bowling alley deal. I gave two previous statements, one to detective Schultz and one to detective Ladd. I didn't tell the whole truth in those statements and want to now so that I don't take this whole thing by myself.
>
> One thing that I didn't tell the truth [about] was that Lat[t] Bloomfield and I did this thing when we first got to the bowling alley, not like I said about being there in the parking lot for awhile. Lat[t] drove in and we were in his brown thunderbird. Lat[t] pulled right to the front door so that the passenger side was next to the bowling alley. I think that there was a couple of cars in the parking lot when Lat[t] pulled to the door. Lat[t] pulled a stocking over his hair so that his hair would be pulled back. I pulled up my t-shirt over my nose and mouth. Lat[t] had his 357 revolver which I think is an R-G model. This gun had about a three inch barrel. He had the gun under his shirt when we walked in a guy asked what we were doing. Lat[t] pulled the revolver and stuck [it] in this guy[']s face and said, 'This is a robbery.' Lat[t] pulled this guy by the hair and made him get down on his knees. Three other people were over by the snack bar and they saw the man on his knees and walked up. This was [sic] two dudes and a girl. Lat[t] told them to get on the floor and if they didn't do what he told them that he would shoot this first guy who was already on the floor. They got down on their knees away from the counter and Lat[t] made them come closer to the control counter and they did. They were laying down from the door so that there was a dude and then a girl and then another dude and

then the last dude. The second dude was trying to look up and Lat[t] told him not to be looking and to turn around and lay facing the way all the others were. He then turned around so that they were all facing back towards the snack bar. The second dude kept looking around so Lat[t] fired a warning shot into the floor. The girl screamed and then Lat[t] told her to shut up and she kept screaming. Lat[t] kicked the girl in the back and the second dude who was the one who kept looking up started to raise up. He was about half way up when La[t] shot him in the back of the head. Then Lat[t] just turned around and shot the third dude. This third dude was the first one Lat[t] grabbed and made get on the floor. He shot him the same way as the first one that he shot. Lat[t] threw me the gun and told me to shoot the other two. I hesitated and then he said, 'Shoot them now.' I aimed the gun at the other guy who was still left who was closest to the door and fired one time. I hit him in the back of the head behind the ear. I walked around the other side of them and hesitated and Lat[t] said, 'Shoot her.' She had her face down and she just looked up at me and I aimed and turned my head and shot her. I think I hit her in the cheek. I had the gun and ran around and looked in the cash register over by where you get the shoes. I got all the bills and a little of the change and then went to the office but the door was locked. I went over to the cash register by the snack bar and took bills out of it too. I put the money in my pockets. I went back by the office and tried to force the door open but I couldn't get it opened. Lat[t] was looking under the counter for a money bag and I think he got 50 or 60 dollars. He walked over by the office and I told him I thought I saw some headlights. I went outside but I didn't see anyone so when I came back in Lat[t] was rumageing [sic] through their pockets and took the wallets out of their pockets. He took the money and I think that he kept the wallets. We looked around to make sure that nobody was looking and we didn't see anybody. I asked him if he wanted to check in the back and he said no. So, we looked in the bathrooms making sure no body [sic] was in there. Then we left. I still had the gun. Lat[t] drove and we had the windows down to his car. He made a right on the highway and drove down for a little bit and then turned around and came back past the bowling alley. I asked him why he shot the dudes and he said he shot the dude for raising up and playing hero. He said he made me shoot the other two so that I would be as guilty as him if we got caught. I put the gun under the front seat after I reloaded it and it only had one live bullet in it before reloading. I don't know where the gun is now. The last time I saw the gun was I believe last

Saturday night and Lat[t] had it at that time. We went to score some pills and got 24 pills over at the dope house. These were preludins. After the gas and pills I got 95 dollars out of the deal and I think Lat[t] got a lot more. We went over to my house and did some preludin and Lat[t] said he was afraid someone had seen his car so he went and took it home. He walked back over to my house that night and we did the rest of the pills. We stayed up all day and went out to the park the next day. I was scared and that is the reason that I did not tell the whole truth before and I feel like shit and feel bad about what happened and ought to take my punishment for it. I think Lat[t] and me both ought to pay for what we did.

Soffar also met with Kardatzke that evening, and they sketched a diagram of the crime scene. The diagram depicted a male victim lying closest to the door, followed by a female, a second male, and a third male.

Lawrence Bryant testified at Soffar's 1981 trial, but he was deceased at the time of Soffar's 2006 trial. The State read his prior testimony into the record. Bryant testified regarding a conversation he had with Soffar "around the last week of July" in 1980. Bryant was sitting in front of the residence of his girlfriend, Mable Cass, when Soffar and two other white men drove up in a brown or beige Thunderbird. Soffar had a gun and wanted to sell it. Bryant testified that the gun was a 9-millimeter nickel plated, automatic with "a clip that goes in the bottom." Soffar asked Bryant if he heard anything about a bowling alley getting robbed, and Bryant said that he heard about it on the news. Soffar asked Bryant if he would believe that he had done it. Bryant asked Soffar if he was crazy, and Soffar was "grinning and laughing like it was funny." Soffar told Bryant he "had shot three people in the back." Soffar also stated that the police would never catch him because "he was too slick." Bryant

bought the gun from Soffar, but Bryant was unable to turn the gun over to the authorities because his cousin broke into his house and stole it and sold it for dope.

Cass testified that she was present during Soffar's conversation with Bryant. She heard Soffar tell Bryant that he killed four people at a bowling alley. Soffar said, "[L]et me show you what I shot 'em with." Soffar took a brown paper bag out of the Thunderbird and showed them the gun that was inside it, stating, "[T]his [is] what I shot the motherfuckers with right here." She described the gun as the type that has a clip in it.

Soffar's sister, Jackie Soffar Butler, testified that she saw Soffar on the morning of July 14th. Soffar's hair was a little longer than shoulder length, and he had a beard and a mustache. When Jackie saw Soffar again around August 1st, he asked her if she had seen or heard about the bowling alley murders and mentioned that there was a $10,000 reward. Soffar stated that "the composite drawing looked like [Bloomfield] and that he wanted to turn him in."

Soffar's mother, Zelda Soffar, testified at Soffar's 1981 trial, but she was deceased at the time of Soffar's 2006 trial. Her prior testimony was read into the record. Zelda testified that Soffar helped a friend move on July 12th and 13th. Soffar received "several cases of empty long neck beer bottles" in exchange for helping his friend move. He came home around 7:00 p.m. on July 13th, and Soffar went to bed after they watched television together. Soffar was at home when Zelda woke up early on the morning of July 14th. They drove to Alvin that day because Soffar wanted to sell the beer bottles for pocket money.

Defense expert Ken Branstein, a forensic scientist, reviewed the evidence in the case. Branstein opined that the type of ammunition used by the assailant was a "38 police special." However, he acknowledged that a person "could shoot a 38 police special from a 357 Magnum gun." Branstein believed that Garner was between Sims and Temple when he was shot. He concluded that "there were 4 bullets and only 4 bullets fired," including the three bullets found at the scene, which passed through the heads of Felsher, Sims, and Garner, and the one bullet recovered from Temple's head during the autopsy. Branstein thought that the physical evidence was inconsistent with Soffar's account; a fifth "warning" shot had not been fired directly into the floor because the "fragment weight totals" did not lead to that conclusion. However, when cross-examined by the State, Branstein agreed that the exact number of grains in the bullets that were fired could not be ascertained because the scene had been contaminated. Branstein thought that the one bullet that went through Sims created two of the four holes in the carpet. He opined that the bullet went through Sims's head, struck the concrete floor at an angle, and then exited the carpet as fragments, hitting Sims in the chest.

## Sufficiency of the Evidence

Soffar was convicted of murdering Felsher in the course of robbing Sims. In point of error seven, he challenges the legal and factual sufficiency of the evidence to support his conviction. He specifically complains that his conviction was based on his unreliable confession, which was "dramatically at odds with the sole eyewitness's description of the

crime and with the other testimonial and physical evidence."

In evaluating the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.[7] This "standard of review gives full play to the jury's responsibility fairly to resolve conflicts in the evidence, to weigh the evidence, and to draw reasonable inferences from the evidence."[8]

Evidence that is legally sufficient may be factually insufficient if it is so weak that the jury's verdict seems clearly wrong and manifestly unjust, or whether, considering conflicting evidence, the jury's verdict, though legally sufficient, is nevertheless against the great weight and preponderance of the evidence.[9] A factual-sufficiency review requires us to consider all of the evidence.[10] "A clearly wrong and unjust verdict occurs where the jury's finding is manifestly unjust, shocks the conscience, or clearly demonstrates bias."[11]

In this case, there were no fingerprints matching Soffar's, the murder weapon was never recovered, and the surviving victim was unable to positively identify Soffar in a lineup. However, Soffar confessed to police that he participated in the robbery and shot two of the

---

[7] *Jackson v. Virginia,* 443 U.S. 307, 319 (1979).

[8] *Threadgill v. State,* 146 S.W.3d 654, 663 (Tex. Crim. App. 2004) (internal quotation marks omitted).

[9] *Watson v. State,* 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006).

[10] *Marshall v. State,* 210 S.W.3d 618, 625 (Tex. Crim. App. 2006).

[11] *Sells v. State,* 121 S.W.3d 748, 754 (Tex. Crim. App. 2003).

four victims. He also said that he told "Pops" about his involvement in the crime a few weeks after the crime, a fact that was later confirmed by both Lawrence Bryant and Mable Cass. Soffar described the murder weapon as either a .38 or a .357 caliber gun and the State's firearms examiner determined that the bullets recovered from the scene and Temple's body were .38 or .357 caliber. Defense expert Branstein opined that the bullets were .38 caliber, but he acknowledged that "[y]ou could shoot a 38 police special from a 357 Magnum gun."

Although there were several discrepancies between Soffar's and Garner's multiple statements to police, some important aspects were consistent. Additionally, portions of Soffar's statements were consistent with some of the physical evidence. Garner told police and testified at trial that the robber first encountered Sims at the front of the bowling alley, then Garner, Temple, and Felsher came up to the front. Soffar told police that Bloomfield first stuck the revolver "in this guy's face," pulled his hair, and made him get down on his knees, then "two dudes and a girl" walked up. Garner told police and testified at trial that the robber took the victims' wallets. Soffar told police that Bloomfield took the victims' wallets, though he thought that Bloomfield kept them. Soffar added that they "had the windows down" when they left the bowling alley, and that Bloomfield "made a right on the highway and drove down for a little bit and then turned around and came back past the bowling alley." One wallet was found in the parking lot and two other wallets were found nearby on the inbound side of the highway.

Soffar said that five shots were fired, including a warning shot fired by Bloomfield into the floor. Garner told police that he thought that he was the third one shot, and he gave varying accounts of the number of shots he heard, ranging from two to four. One bullet was recovered from Temple's head and three bullets were recovered from the crime scene. Eleven bullet fragments were also recovered from the crime scene, and there were four bullet holes in the carpet and a divot in the concrete that contained some fragments. Defense expert Branstein disputed that a warning shot was fired. However, the evidence, viewed in the light most favorable to the verdict, could have led jurors to rationally find that there was a warning shot.

Soffar's sister testified that, about four days before his arrest, Soffar mentioned the reward and said that the composite drawing looked like Bloomfield and that he wanted to turn him in. After he was arrested, Soffar told police different versions of the events that transpired. Soffar initially said that he was merely a party to the offense, claiming that Bloomfield committed the robbery and shootings while he waited outside the bowling alley in the car. Soffar confessed to actively participating in the robbery and shootings only after he learned that Bloomfield had been released from custody.

Garner also gave police varying accounts of what happened. Police began questioning Garner only three days after his brain surgery. Garner's description of the assailant ranged from a "20 foot" tall black man to a white man who was a little taller and bigger than himself. He first told police that the assailant gained entry by asking for water. Later, he

said that the assailant asked for air for his tires. When he testified at trial, he did not recall how the assailant entered the bowling alley. He was unclear on the number of shots that he heard. He told police that he laid down next to Felsher after using the telephone. However, he testified at trial that the only thing he remembered after using the telephone was seeing headlights, his father walking into the bowling alley, and then waking up in the hospital.

Garner's and Soffar's accounts about the robbery and shootings varied. Their accounts were inconsistent regarding: whether there were one or two robbers; whether the robber or robbers were disguised; how the robber or robbers gained entry to the bowling alley; whether any of the victims screamed or were kicked; whether a warning shot was fired; the positions of the victims when they were shot; whether the cash register was emptied before or after the shootings; and whether the victims' wallets were taken before or after the shootings. Given the numerous inconsistencies, the jury was faced with a credibility choice. Garner's credibility was affected by his memory loss. And Soffar's credibility was affected by his (1) false confession to the burglary of the bowling alley on July 12th, (2) attempt to blame Bloomfield for the robbery and shooting the victims while he waited outside in the car, and (3) false accusation that Bloomfield robbed the U-Totem convenience store. "Because the jury is the sole judge of a witness's credibility, and the weight to be given the testimony, it may choose to believe some testimony and disbelieve other testimony."[12] The jury in this case was free to take all of the evidence into account and to believe or disbelieve any portion

---

[12] *Lancon v. State,* 253 S.W.3d 699, 707 (Tex. Crim. App. 2008).

of Soffar's statements about the offense and other offenses, Garner's statements to police, or Garner's trial testimony.[13]  We should afford almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility.[14]  With this in mind, we hold that the totality of the evidence, when viewed in the light most favorable to the verdict, was sufficient for a rational trier of fact to find the essential elements of the offense beyond a reasonable doubt.  Further, the jury's verdict is not against the great weight and preponderance of the evidence.[15]  Nor is the evidence so weak that the jury's verdict seems clearly wrong and manifestly unjust.[16]  Having determined that the evidence is legally and factually sufficient to support Soffar's conviction, we overrule his seventh point of error.

## Alternative Perpetrator Evidence

At trial, Soffar wanted to present evidence that the offense was committed by an alternative perpetrator, Paul Reid.  In his "Motion to Introduce Evidence Showing Paul Dennis Reid to be the Real Perpetrator of the Bowling Alley Murders,"  Soffar alleged that in 1981 or 1982, Paul Dennis Reid, a man then living in the Houston area and who is now incarcerated on death row in Tennessee, told a friend that he had shot four people during a robbery at a bowling alley located on U. S. Highway 290.  In the motion, Soffar stated that

---

[13]  *See Prible v. State,* 175 S.W.3d 724, 730-31 (Tex. Crim. App. 2005); *Sorto v. State,* 173 S.W.3d 469, 475 (Tex. Crim. App. 2005).

[14]  *Lancon,* 253 S.W.3d at 705.

[15]  *Watson,* 204 S.W.3d at 414-15.

[16]  *Id.*

he specifically wanted to introduce Reid's confession to the crime charged, evidence of Reid's physical appearance at the time of that crime, and Reid's past criminal activity.

In point of error one (a), Soffar alleges that the trial judge erred under Texas Rule of Evidence 803(24) by excluding statements against interest establishing that Paul Reid told an accomplice during a Houston robbery that he had previously shot four people in a bowling alley on Route 290. At issue are Reid's alleged statements to Stewart Cook, an individual who claimed to have committed thirty to forty robberies with Reid in the Houston area from 1981 to mid-1982. Cook gave an affidavit to Soffar's post-conviction counsel on April 1, 2000, in which he stated:

> Although Paul sometimes fired his gun during the robberies, during most of the robberies we committed together, he never shot anyone (often because I persuaded him not to). However, all this changed after one particular robbery, when Paul used his pistol. I did not understand why Paul had used his gun and asked him why he did it. Paul brushed it off, telling me he'd done much worse during a robbery he had committed before we started working together. Specifically, he said that he once had a "problem" while he was robbing a bowling alley out on Route 290, and he had shot "four people." I asked him what happened to them; he just said they were "okay now." At the time, I didn't know what he meant by this. I now realize that he was talking about the Fairlanes Bowling Alley murders that occurred in 1980.

Soffar's defense attorneys wanted to prove Reid's statement by calling Cook to testify about it at trial. But Cook stated, on the record and outside the jury's presence, that he would assert his Fifth Amendment right against self-incrimination if asked to testify regarding the contents of his affidavit. Soffar's attorneys requested that Cook be granted immunity for his testimony, but the trial judge refused to force the State to grant immunity. They then

attempted to call Soffar's post-conviction counsel, Jonathan Scott, to testify about his conversations with Cook. The trial judge inquired, "Assuming that what Paul Reid said was a statement against interest what's the hearsay exception for somebody to say what Cook said to him?" Defense counsel responded that the applicable hearsay exception was a statement against criminal interest. The trial judge declined to allow Scott to testify regarding Cook's affidavit.

Texas Rule of Evidence 805, which governs hearsay within hearsay, provides:

Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules.

Soffar's attorneys wanted Scott to take the stand to testify about (1) Reid's statement to Cook and (2) Cook's statement to Scott. Thus, in order to be admissible, Scott's testimony must be justified on two levels: there must be a hearsay exception that applies to Reid's statement to Cook and a hearsay exception that applies to Cook's statement to Scott.

Texas Rule of Evidence 803(24) provides an exception to the hearsay rule for statements against the declarant's interest. It dictates that a hearsay statement tending to expose the declarant to criminal liability is admissible if corroborating circumstances clearly indicate the trustworthiness of the statement. Rule 803(24), however, "does not provide an exception for a declarant's statements against someone else's interest, such as a third party, co-actor, or co-defendant, unless the statement against the other person's interest is also

sufficiently against the declarant's interest to be considered reliable."[17]

Even assuming that the first level of hearsay (Reid's statement to Cook) conforms with the statement against interest exception, Scott's testimony would still be inadmissible because the second level of hearsay (Cook's statement to Scott) does not conform with that exception. Cook admitted in his affidavit that he committed numerous robberies with Reid, but he stated that he had already been convicted and sentenced for some of these crimes. Cook admittedly did not go to the authorities when Reid initially acknowledged his involvement in a robbery and shooting at a bowling alley, but Cook stated in his affidavit that he did not realize the connection to the instant crime until many years later. Even if Cook's statements regarding his participation in uncharged robberies and his failure to report a crime could qualify as statements against interest, Cook's statements regarding Reid's alleged admission of guilt do not.[18] Those particular statements are solely against Reid's interest.[19] Cook's statements to Scott about Reid's admission of guilt were not sufficiently against Cook's interest to be considered reliable. Thus, the trial judge did not abuse her discretion in excluding Scott's testimony on this subject. Point of error one (a) is overruled.

In point of error one (b), Soffar asserts constitutional challenges to the trial judge's

---

[17] *Simpson v. State*, 119 S.W.3d 262, 269 (Tex. Crim. App. 2003) (citing *Guidry v. State,* 9 S.W.3d 133, 149 (Tex. Crim. App. 1999)).

[18] *See Hughes v. State*, 4 S.W.3d 1, 6 n.10 (Tex. Crim. App. 1999).

[19] *See id.*

exclusion of Reid's alleged statements to Cook. Citing *Holmes v. South Carolina*,[20] Soffar alleges that the trial judge's application of the hearsay rule deprived him of his federal constitutional right to present a defense. He also claims that the exclusion of this evidence violated his rights under the Texas Constitution. We conclude that Soffar's state constitutional claim is inadequately briefed. Therefore, we decline to address it because he does not provide separate authority or argument for it.[21]

We now turn to Soffar's federal constitutional claim. "[T]he [federal] constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.[22] This right is abridged by evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve."[23] In *Holmes*, the defendant sought to introduce proof that another man committed the crime.[24] The trial judge excluded the evidence under the *Gregory* rule governing the admissibility of third-party guilt evidence.[25] The purpose of the *Gregory* rule was "to focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the

---

[20] 547 U.S. 319 (2006).

[21] *Heitman v. State*, 815 S.W.2d 681, 690 n.23 (Tex. Crim. App. 1991).

[22] *Holmes*, 547 U.S. at 324 (internal citations omitted).

[23] *Id.*

[24] 547 U.S. at 323.

[25] *Id.* at 323-24 (citing *State v. Gregory*, 16 S.E.2d 532 (S.C. 1941)).

central issues."[26] The United States Supreme Court held that the rule was "arbitrary" because it did not rationally serve the end that it was designed to further.[27] The Court also provided other examples of arbitrary rules that "excluded important defense evidence but that did not serve any legitimate interests."[28]

In this case, Soffar challenges the exclusion of Reid's alleged out-of-court statements to Cook. Out-of-court statements are subject to four "dangers"—faulty perception, faulty memory, miscommunication, and insincerity.[29] Such statements generally do not have the same safeguards that are present for in-court statements, such as "the oath, the witness' awareness of the gravity of the proceedings, the jury's ability to observe the witness' demeanor, and, most importantly, the right of the opponent to cross-examine."[30] The hearsay rule serves to minimize these dangers for out-of-court statements.

The exclusion of Reid's statements under the hearsay rule did not amount to constitutional error. In this case, as applied by the trial judge, the rule barring the admission of hearsay was not arbitrary or disproportionate to its purpose, which is to prevent the

---

[26] *Id.* at 330.

[27] *Id.* at 331.

[28] *Id.* at 325-26 (citing *Washington v. Texas*, 388 U.S. 14 (1967); *Chambers v. Mississippi*, 410 U.S. 284 (1973); *Crane v. Kentucky*, 476 U.S. 683 (1986); *Rock v. Arkansas,* 483 U.S. 44 (1987)).

[29] *Williamson v. United States*, 512 U. S. 594, 598 (1994); *Walter v. State*, 267 S.W.3d 883, 889 (Tex. Crim. App. 2008).

[30] *Williamson*, 512 U.S. at 598.

admission of statements that are regarded as inherently unreliable. Cook's affidavit documented a twenty-year-old admission allegedly made by Reid. And when Soffar was retried, Cook refused to talk to law-enforcement officials about Reid's alleged admission. Cook also refused to recount Reid's alleged admission in a court of law where the State, through cross-examination, could challenge its reliability. Therefore, the trial judge's ruling did not deprive Soffar of a meaningful opportunity to present a complete defense. Point of error one (b) is therefore overruled.

In points of error two (a) and (b), Soffar argues that the trial judge violated his constitutional right to present a defense by refusing to grant immunity to Cook and failing to compel Cook to testify. As noted above, Cook stated that he would assert his Fifth Amendment right against self-incrimination if asked to testify about the contents of his affidavit. When questioned by defense counsel, Cook testified in pertinent part:

> Q. And have you advised us that as a result of the conversation you had with an attorney that you intend to assert your right against self-incrimination regarding . . . the contents of your interview with attorneys for Mr. Soffar?
>
> A. Yes. That's correct.
>
> Q. And the . . . subject matter that you would be testifying to is the statement that you gave to Mr. Schraub and Mr. Scott back in 2000?
>
> A. Yes, 2000.
>
> Q. And you believe on advice of counsel that you intend to assert your Fifth Amendment Right as to the contents of that conversation and the contents of the affidavit that you gave?

A.  Yes.

Q.  And you believe that any testimony might incriminate yourself regarding possible acts that were committed back in 1982, '83?

A.  Yes.

Q.  If The Court [sic] gave you immunity to testify would you freely testify?

A.  Possibly.

Q.  If The Court [sic] compelled you to testify would you testify?

A.  No, I would not.

Q.  If she ordered you to testify and gave you immunity?

A.  I guess if I'm ordered to I guess I would have to.

Q.  And if she gave you immunity to say that nothing you say can be used against you in any prosecution of you would you testify?

A.  Possibly.

Q.  But based upon the advice of counsel you intend to assert your Fifth Amendment privilege?

A.  That's correct.

Q.  And you refuse to testify about events that occurred in 1982 --

A.  That's correct.

After Cook testified, the judge recessed for lunch. When the parties returned, the prosecutor stated, outside the jury's presence, that Cook went straight out and talked to the media during the break and that defense counsel directed the media to Cook's affidavit. The

prosecutor complained that the defense was using a tactic to expose the jury and the public to uncontroverted information that has not been cross-examined, and he asked that Cook be brought back and instructed not to have any further conversations with the media. Defense counsel stated that "we have no intention of bringing him back unless The Court grants immunity or orders him to appear." The trial judge replied, "I'm not going to force the State to grant immunity."

The parties later discussed the issue of Cook's Fifth Amendment privilege. Defense counsel stated that Cook "ostensibly" had a Fifth Amendment privilege with regard to the unprosecuted aggravated robbery in which Reid fired a gun at someone because "that's attempted capital murder for which there is no statute of limitations." Defense counsel elaborated that Cook would not have a Fifth Amendment privilege if it was just a robbery because the "statute of limitations for robbery is only 3 years where attempted capital murder is unlimited." The prosecutor said that the State was aware of the aggravated robberies and that Cook had already pled to one or two of them. Defense counsel responded:

> If that's the case he has no Fifth Amendment privilege and The Court [sic] can compel him to testify. He does not have a valid assertion of Fifth Amendment privilege and [if] the limitations has run on that crime and he has no valid privilege then you can compel him to testify.

The prosecutor countered:

> Well, Your Honor, the lawyer for Mr. Cook has advised him that he is subject to being prosecuted not for the aggravated robbery but attempted capital murder, that being a robbery where a shooting occurred. No limitations to prevent us from doing that and that's correct and based upon advice of counsel and not Mr. Schneider that

he's invoked Fifth Amendment privilege which he does have liabilities in that situation but I think we're getting far afield.

The parties revisited the issue after the State rested its case. Defense counsel pointed out that Cook had "already been incarcerated for robberies arising from his dealings with Paul Reid." Defense counsel further claimed that it was "a stretch" to say that Cook could be prosecuted for attempted capital murder, pointing out that Cook's affidavit had "been on file for over five years" and the State had yet to pursue prosecution on that charge. Defense counsel argued that Cook was not making a "good faith" assertion of his Fifth Amendment privilege "given these circumstances" and that Soffar's "right to present [a] defense overrides any of those concerns." The trial judge responded, stating that she was "not going to force [Cook] to testify."

Soffar argues that a trial judge must grant immunity without the prosecution's consent if it is necessary to uphold a defendant's right to compulsory process and cites *Norman v. State*.[31] There, law-enforcement officials received a tip from an informant, Dewayne Hamilton, that Norman would be selling heroin at a specified time and location.[32] Law-enforcement officials went to that location at the designated time, and Norman sold them heroin.[33] At her trial, Norman wanted to call Hamilton to testify in support of her "vicarious

---

[31] 588 S.W.2d 340 (Tex. Crim. App. 1979).

[32] *Id*. at 342.

[33] *Id*.

entrapment" defense.[34] Hamilton refused to testify, citing the Fifth Amendment.[35] Inquiring into Hamilton's assertion of the Fifth Amendment, outside the jury's presence, Norman's attorney questioned Hamilton about his relationship with a law-enforcement officer and another individual who had been involved in the drug transaction as well as the heroin delivery.[36] Hamilton asserted his Fifth Amendment privilege to all of the questions.[37] The trial judge did not inquire into the validity of Hamilton's assertion and refused to grant Hamilton immunity from prosecution.[38] We held that "given the facts of this case regarding Hamilton's informer-agent status, it is axiomatic that [Norman] has a right to call him as a defense witness and offer his testimony to the jury."[39] As a result, we concluded that the trial judge committed constitutional error when refusing Norman's immunity request.[40]

This case is distinguishable from *Norman*. In *Norman*, immunity from prosecution applied only to the facts and circumstances of the heroin offense, the offense for which Hamilton acted as a state agent. Here, immunity from prosecution would have been extended to an attempted capital murder (and possibly a variety of other offenses), completely

---

[34] *Id*. at 343.

[35] *Id*. at 343-44.

[36] *Id*. at 344.

[37] *Id*.

[38] *Id*.

[39] *Id*.

[40] *Id*.

unrelated to the bowling-alley murders, which Cook committed in the absence of any state-agency status. Thus, we cannot say that our decision in *Norman* supports Soffar's claim.

Soffar cites *Government of the Virgin Islands v. Smith*, which recognizes a constitutional right to immunity for a witness whose testimony would be exculpatory and essential to the defense and the government has no strong interest in withholding immunity.[41] However, the Third Circuit Court of Appeals's ruling in *Smith* has been rejected by state and federal courts.[42] In Texas, a trial judge may grant immunity only with the consent of the State.[43]

Soffar primarily relies on *Autry*, which states "that a constitutional right to immunized testimony might exist to remedy prosecutorial abuse."[44] Abuse may occur where the State "has no legitimate purpose for refusing immunity and did so to deprive the defense of essential exculpatory testimony."[45] Even if we were to agree with *Autry*, we find no abuse here. In this case, there is no evidence in the record that would support such a showing. Soffar contends that the State had no legitimate purpose in refusing immunity because it had

---

[41] 615 F.2d 964, 974 (3rd Cir. 1980).

[42] *Norwood v. State*, 768 S.W.2d 347, 349 (Tex. App.—Corpus Christi 1989), *pet. dism'd, improvidently granted*, 815 S.W.2d 575 (Tex. Crim. App. 1991); *Autry v. Estelle*, 706 F.2d 1394, 1401 (5th Cir. 1983).

[43] *Graham v. State*, 994 S.W.2d 651, 654 (Tex. Crim. App. 1999); *see also Autry*, 706 F.2d at 1402.

[44] *See Norwood*, 768 S.W.2d at 350 (citing *Autry,* 706 F.2d at 1401).

[45] *Autry*, 706 F.2d at 1402.

known about the attempted capital murder offense since 1982 and never prosecuted Cook

during that time. But, as Soffar notes, the State informed the trial judge that Cook could not

be granted immunity over its objection. In making this assertion, the State notified the trial

judge of its interest of leaving a future prosecution of Cook within its discretion. Thus, the

State had a legitimate purpose in withholding immunity. Point of error two (a) is therefore

overruled.

In point of error two (b), Soffar alleges that the trial judge violated his constitutional

right to present a defense by failing to compel Cook to testify because his invocation of the

right against self-incrimination was improper. He complains that the trial judge failed to

inquire about and rule on the validity of Cook's invocation of his Fifth Amendment rights.

"An individual's constitutional privilege against self-incrimination overrides a

defendant's constitutional right to compulsory process of witnesses."[46] A trial judge "cannot

compel a witness to answer unless it is perfectly clear, from a careful consideration of all the

circumstances in the case, that the witness is mistaken in asserting the privilege, and that the

answer cannot possibly tend to incriminate the witness."[47]

The trial judge, after hearing Cook's testimony and the arguments from the defense

and the State, outside the jury's presence, ruled that she was not going to force Cook to

testify. The prosecutor argued that Cook's attorney had advised him that he was subject to

---

[46] *Bridge v. State*, 726 S.W.2d 558, 567 (Tex. Crim. App. 1986); *Grayson v. State*, 684 S.W.2d 691, 696 n.2 (Tex. Crim. App. 1984).

[47] *Grayson*, 684 S.W.2d at 696.

prosecution for attempted capital murder and that there were no limitations to prevent the State from doing that. That the State had not yet pursued prosecution on that charge did not mean that it could not or would not do so in the future. The circumstances did not show "that the answer cannot possibly tend to incriminate the witness."[48] Point of error two (b) is therefore overruled.

In point of error three, Soffar argues that the trial judge denied his constitutional right to present a defense "by precluding evidence of Paul Reid's distinctive *modus operandi* in his brutal Texas and Tennessee crimes, which marked him as the perpetrator of the remarkably similar Fairlanes robbery-murders."

In his "Motion to Introduce Evidence Showing Paul Dennis Reid to be the Real Perpetrator of the Bowling Alley Murders," Soffar stated his desire to introduce evidence of three other crimes committed by Reid: (1) the Captain D's Robbery and Murders committed on February 16, 1997, in Donelson, Tennessee; (2) the McDonald's Robbery and Murders committed on March 23, 1997, in Hermitage, Tennessee; and, (3) the Baskin-Robbins Robbery and Murders committed on April 23, 1997, in Clarksville, Tennessee. He later filed another "Motion to Introduce Evidence of the Crimes of Paul Dennis Reid to Establish the Identity of the Real Perpetrator of the Fairlanes Crimes." In the written motions and during the pretrial hearings on these motions, defense counsel argued that the evidence was admissible under Texas Rules of Evidence 404(b) and 403 and that the exclusion of this

---

[48] *Id.*

evidence would deprive Soffar of his constitutional right to present a defense. The trial judge ultimately ruled that the extraneous offenses from Tennessee were inadmissible.

An evidentiary ruling can "conceivably rise to a constitutional violation" if it is a "clearly erroneous ruling which excludes admissible evidence and which effectively prevents the defendant from presenting his defense."[49]

Rule 404(b) provides, in pertinent part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, identity, or absence of mistake or accident . . . .

Soffar tried to prove the identity of the offender by offering evidence of Reid's modus operandi in three other crimes. Under the modus operandi rationale, "the pattern and characteristics of the charged crime and the [extraneous offenses] are so distinctively similar that they constitute a 'signature.'"[50] "[T]he common characteristics may be proximity in time and place, mode of commission of the crimes, the persons's dress, or any other elements which mark both crimes as having been committed by the same person."[51] But "if the similarities are 'generic,' i.e., typical to this type of crime, they will not constitute a 'signature' crime."[52]

---

[49] *Wiley v. State*, 74 S.W.3d 399, 405-06 (Tex. Crim. App. 2002).

[50] *Segundo v. State*, 270 S.W.3d 79, 88 (Tex. Crim. App. 2008).

[51] *Id*.

[52] *Id*.

The characteristics of this offense and Reid's extraneous crimes are not so distinctively similar so as to constitute a signature. Reid's crimes in Tennessee are generic in the sense that they are like numerous other offenses committed across this country each year. There is no distinct manner, means, or pattern involved in the commission of the Tennessee offenses that constitute a distinct signature so as to permit the logical inference that Reid was responsible for this offense. This offense was committed in Texas in 1980; Reid's other crimes were committed years later in Tennessee. Here, the crime occurred at night, and the victims were shot near the front doors of the bowling alley. The Captain D's offense occurred in the morning, and Reid shot the victims in the restaurant's walk-in cooler.[53] In the McDonald's offense, Reid ordered the victims into a storage area, where he shot three of them and stabbed one of them.[54] In the Baskin-Robbins offense Reid abducted the victims and stabbed them to death at another location.[55] Given these dissimilarities, the trial judge did not abuse her discretion in excluding the evidence of Reid's other crimes. Soffar has not shown that the trial judge made a clearly erroneous ruling that excluded admissible evidence and that effectively prevented him from presenting his defense.[56] Point of error three is therefore overruled.

## Exclusion of Media Evidence

---

[53] *State v. Reid*, 91 S.W.3d 247, 261 (Tenn. 2002).

[54] *State v. Reid*, 213 S.W.3d 792, 805 (Tenn. 2006).

[55] *State v. Reid*, 164 S.W.3d 286, 297-98 (Tenn. 2005).

[56] *Wiley*, 74 S.W.2d 399 at 405-06.

In point of error four, Soffar argues that the trial judge violated his constitutional right to present a defense by excluding evidence showing that the Houston media broadcast details of the crime. He asserts that the excluded media evidence was essential to the defense theory that his confession was unreliable. He contends, "Without this evidence, the defense could not point to the contents of the media reports as the source of the information in Soffar's custodial statements." According to Soffar, his statements do not contain any information not reported through the media. As a result, he could not point to the contents of the media reports as the source of the information in his statements. In that vein, Soffar points to the following facts about that offense that were in the media:

(1) four people had been shot execution style;
(2) one man survived;
(3) one the victims was female, who was shot in the cheeck;
(4) money was taken from the cash register;
(5) the shootings took place at the Fair Lanes Windfern;
(6) a .357 was used;
(7) reward money was available;
(8) the bowling alley was burglarized the night before the offense;
(9) images of the exterior of the building, including the parking lot;
(10) images of the interior of the building;
(11) a close-up of Garner's wound; and
(12) the four victims.

Defense counsel initially offered "a newspaper story from the Houston Chronicle dated July 14, 1980," and asked Detective Schultz to look at the article and state whether it reported the location of the offense. The prosecutor objected, arguing that the article was inadmissible because it contained hearsay and irrelevant speculation. The prosecutor clarified, "We don't object to them asking was this reported in the paper or was it at the Fair

Lanes Bowling Alley or occurred this time." Defense counsel stated that "[t]here was a great deal of detail that was reported about this case" and that "it's not one article it's a combination of several articles and several news reports." The prosecutor said, "I will agree to [a] Joint Exhibit to say certain things are in the public domain." The trial judge refused to admit "entire articles into evidence," given that "[t]here's too much irrelevant stuff in the articles," but allowed the defense to "ask him if certain things were in the paper, the points." Defense counsel then questioned Schultz:

Q. So it's your testimony Mr. Schultz that where the bowling alley was located was in fact reported in the news media?

A. Yes.

Q. Before August 5th 1980?

A. Yes.

Q. The time of night that the offense occurred was also reported in the news media before August 5th 1980 wasn't it?

A. I don't know. It possibly could have been but I don't recall.

Q. If it was reported in the news media before August 5th 1980 the time of night that the offense occurred then that information would be public domain, correct?

A. Yes.

Q. And so the fact that somebody knew the time of night that the offense occurred that it had been in the news media doesn't necessarily mean that they had been at the crime scene? Correct?

A. That's correct.

Q.      Now, the news media also reported and showed on television the bowling alley itself didn't it?

A.      I don't recall.

Q.      Well, if pictures of the bowling alley were displayed in the news media showing a location of the front doors then this information too would be in the public domain wouldn't it?

A.      Yes.

Defense counsel later informed the judge that he compiled "summary charts of all the newspaper articles," but the State did "not want to stipulate to that information." Thus, defense counsel stated that he needed "to go back and revisit that with either Schultz or [Detective] Williamson." The prosecutor argued:

> It's our position Judge what was in the public domain isn't relevant to this case unless it's tied to the Defendant. If the Defense has some information that the Defendant read a particular article or what information the Defendant read that's one thing but our objection is to the Defense being allowed to cross-examine each witness about what may or may not have been in the public domain. That doesn't have any relevance to this case unless they can connect it to the Defendant . . . You know what was in the public domain is not relevant. What would be relevant would be you know the Defendant was saying I read a particular article or a witness saying the Defendant read a particular article perhaps.

Defense counsel countered:

> And so it's relevant to show that the information contained in the statements was in the public domain and that not simply the information that he knew makes him the killer, that it was information that was easily gleaned from the media, the name of the bowling alley, the location of the bowling alley, the number of people that were shot, things that were in the public domain, the location of the bowling alley.

The trial judge ruled:

Well, I'm not admitting articles. I don't know if I'm going to allow cross-examination on it. I guess I have to hear the question and hear what the witness says about that he read the article and he knows about what the article says and all that. So ask your question and then make an objection and I'll make a ruling.

Defense counsel then questioned Detective Kenny Williamson on the subject. Williamson acknowledged that the media reported the location of the murders and the number of people who were shot. Defense counsel continued to ask Williamson specific questions about what was reported by the media, and the prosecutor objected:

Your Honor, I would object to this, to my knowledge line of [sic] detailed questions about what was or was not in the media through this officer. It's hearsay to him and I don't know what relevance that is, that it was in the media.

The trial judge sustained the objection. Defense counsel then questioned Williamson:

Q.     Mr. Williamson from July 14, 1980 to August 1st 1980 there were a large number of reports in the media about this particular shooting.

A.     It was reported in the media.

Q.     And there were a large number of reports in the media?

A.     I can't say. I don't know.

Q.     And the reports had details in it, facts about the case?

    [PROSECUTOR]: Your Honor, again that's going to be calling for -- if he doesn't remember and also calls for hearsay.

    THE COURT: Sustained.

Defense counsel later tried to introduce media evidence by calling a "summary witness to testify about the . . . details of the publicity that were reported on in the news from

July 14 through August 1st." Defense counsel also wanted to introduce "summary charts" of all media information, or at least introduce what was reported on "Channel 13 Eyewitness News" and in the "Houston Post." Defense counsel argued that the evidence was "relevant . . . and probative under 403" and that exclusion of the evidence would violate his Sixth Amendment right to present a defense. The trial judge refused to admit the evidence.

Assuming that the trial judge erred in refusing to admit Soffar's media evidence, we conclude, beyond any reasonable doubt, that any constitutional error did not contribute to Soffar's conviction.[57]

First, Soffar's defensive theory is not particularly compelling. Soffar failed to present any evidence showing that he had been exposed to all of the various media reports that he submits in support of this trial theory. Without establishing any affirmative link between his statements about the offense and the various media reports that were issued about the offense, Soffar's argument is weak.

Second, Soffar was not prevented from presenting general evidence in support of his claim that his confession was unreliable because it could have been gleaned from media reports about the offense. Schultz and Williamson testified that the media reported on the crime. The evidence showed that when Schultz interrogated Soffar on August 5th, Soffar mentioned that he had seen and heard about the crime, the reward, and the surviving victim on the news. Additionally, when Assistant District Attorney Terry Wilson interrogated

---

[57] T EX. R. APP. P. 44.2.

Soffar, Soffar told Wilson that he had watched television news coverage about the crime the next night. Soffar's sister also testified that Soffar generally read the newspaper and listened to the news on television and the radio. She also testified that Soffar had told her "[t]hat there was a $10,000.00 reward" and "[t]hat the composite drawing looked like Latt and that he wanted to turn him in." And defense counsel highlighted this line of defense during closing argument. For example, defense counsel argued:

> But you know it's not just that clip you see there are 3 other times on August 5th 1980 that Max Soffar mentions seeing things on the news to Schultz or Terry Wilson and what he tells Wilson is he seen [sic] the initial story on the news that night, that he watched it on the news and Terry Wilson credits what Max Soffar is saying because then he asks him later on do you think that Latt saw his picture on TV, meaning has Latt seen the composite.

> All right. So it's not like this information is going in one ear and coming out the other. They're crediting, they're hearing Max Soffar when he says I've seen this on the news and he tells them again I seen that poor little kid in his hospital bed. Greg Garner was in the hospital under an assumed name at that point with an armed guard . . . The only way he could have seen that poor little kid in his hospital bed was on TV and it goes on because on August 6, 1980, Max Soffar also tells Williamson that he knows about the crime through the news 'cause again he tells him I've seen that kid on TV. Now even Gil Schultz had to admit if the information about the crime was in the media it was in the public domain and if it's in the public domain that doesn't mean that if you know it you committed the crime. All it means is you describe [sic] to the newspapers and you watch TV, Channel 13 eyewitness news.

Counsel also argued that Soffar "had to have learned about the bowling alley burglaries from the news. You want to know why because the police came in here and told you."

Third, Soffar's August 7th confession to Detective Ladd includes two facts that were not reported to the media—that the office door at the bowling alley was locked and that the victims' wallets were taken during the offense. Soffar stated that he tried to enter the office

of the bowling alley, but walked away because it was locked. He later returned and tried to force it open. The media evidence in the record shows that three sources reported that the office had not been entered. But none of the reports indicated that the office had been locked. Jim Peters, who arrived at the bowling alley before the paramedics and police, testified that the office door had been locked. Additionally, Soffar told Detective Ladd that Latt had kept the victims' wallets. The evidence at trial showed that a police officer found one of the victims' wallets in the parking lot, and a truck driver discovered two more the following day beside the road. The media reported only that one of the victims' wallets was found in the parking lot of the bowling alley. Thus, that the wallets were taken during the offense was a piece of information that had not been reported by the media. Soffar's statement about the locked office door and the wallets strongly undermine his contention that his knowledge about the offense derived solely from media reports. This leads us to make the following observation: Had Soffar's attorneys been permitted to present the media evidence to the jury and compare the specific facts contained in Soffar's statements with those reported by the media to show that Soffar's confession was unreliable, the State could have easily rebutted this argument with Soffar's statement about the locked office door and the victim's wallets. These critical facts would likely have markedly weakened Soffar's "unreliable confession" theory.

Finally, we cannot overlook the effect of Soffar's admission to Bryant and Cass. Soffar initiated a conversation about the offense with Bryant, his drug supplier, and Cass, Bryant's girlfriend, within weeks of the offense. Soffar told them he committed the offense,

laughed about it, and told them that he was "too slick" to get caught. Soffar makes no argument in his brief that this particular admission was unreliable.

Based on the foregoing, we conclude that the exclusion of the media evidence, if error, was harmless beyond a reasonable doubt. We overrule Soffar's fourth point of error.

### Preclusion of Evidence that Undermined the Prosecution's Case and Impeached the Investigation

In his eighth point of error, Soffar claims that the trial judge violated his constitutional right to present a defense by repeatedly precluding evidence which undermined the prosecution's case and impeached the police investigation. He points out numerous instances in which the judge sustained the State's objections to the testimony of several different witnesses. When the State objected in these particular instances, defense counsel made various responsive arguments as to why the evidence should be admitted. However, defense counsel did not argue that the exclusion of the evidence would violate Soffar's constitutional right to present a defense. Consequently, this point of error is not preserved for our review[58] and is therefore overruled.

### Motion to Quash the Indictment

In points of error five (a) and (b), Soffar alleges that the trial judge erroneously denied his motion to quash the indictment because the grand-jury selection process violated his rights to due process, equal protection, and a fair cross section. The State argues that these claims should be overruled under Texas Code of Criminal Procedure Article 19.27. That

---

[58]T EX. R. APP. P. 33.1.

provision states:

> Before the grand jury has been impaneled, any person may challenge the array of jurors or any person presented as a grand juror. In no other way shall objections to the qualifications and legality of the grand jury be heard. Any person confined in jail in the county shall upon his request be brought into court to make such challenge.

We have interpreted this provision to mean that the array must be challenged at the first opportunity, which ordinarily means when the grand jury is impaneled.[59] Soffar contends that he could not challenge the array as required by Article 19.27 because he was arrested after the grand jury was impaneled. However, Soffar did not challenge the array until he filed his motion to quash, which was twenty-five years after the jury was impaneled. He failed to challenge the array at the first opportunity; thus, his challenge to the legality of the grand jury was untimely. Points of error five (a) and (b) are therefore overruled.

**Failure to Preserve Exculpatory Evidence**

In points of error six (a) and (b), Soffar argues that the State's failure to preserve exculpatory evidence violated his rights to due process and a fair trial under the United States Constitution and his right to due course of law under the Texas Constitution. Soffar complains about the State's failure to preserve the following evidence: (1) Garner's four audio-taped statements; (2) the water jug found on the control-booth counter at the crime scene; (3) Sims's shirt; (4) bullets and bullet fragments; and (5) pieces of carpet and padding

---

[59] *Muniz v. State*, 573 S.W.2d 792, 796 (Tex. Crim. App. 1978) (citing *Valdez v. State,* 408 S.W.2d 109 (Tex. Crim. App. 1966)).

taken from the crime scene. For purposes of this appeal, we will assume that each of Soffar's federal and state constitutional claims were properly preserved.[60]

We begin by examining Soffar's federal constitutional claim. Toward that end, we turn to *Arizona v. Youngblood*, the seminal United States Supreme Court access-to-evidence case that Soffar relies on in support of his claim. Under *Youngblood*, to establish a violation of the Due Process Clause when the government fails to preserve potentially useful evidence, a defendant must establish that officials acted in bad faith.[61] Soffar implicitly acknowledges that he cannot show that officials acted in bad faith. And Soffar has not argued or proved that the State acted in bad faith by failing to preserve the evidence at issue. Finally to the extent that Soffar's claim, as it pertains to the four recorded interviews of Garner's statements, may be construed as falling under *California v. Trombetta*, his contention is still without merit in the absence of a showing of bad faith.[62] Soffar's point of error six (a) is therefore overruled.

In arguing that he is entitled to relief under the Texas Constitution's due-course-of-law provision, Soffar relies on the Waco Court of Appeals's opinion in *Pena v. State*.[63] In that case, the Waco court held that "the State has a duty to preserve material evidence which has apparent exculpatory value, encompassing both exculpatory evidence and evidence that is

---

[60]T EX. R. APP. P. 33.1; *see also Pena v. State*, 285 S.W.3d 459 (Tex. Crim. App. 2009).

[61] 488 U.S. 51, 56 (1988).

[62] 467 U.S. 479, 488 (1984).

[63] 226 S.W.3d 634, 651 (Tex. App.—Waco 2007).

potentially useful to the defense."[64]  The Waco court determined that, unlike the Due Process

Clause, the due-course-of-law provision does not contain a bad-faith requirement.[65]  The court

opted for a balancing test.[66]  In assessing whether the due-course-of-law provision has been

violated, according to the Waco court, appellate courts must weigh three factors:

(1)  would the evidence have been subject to discovery or disclosure;
(2)  if so, did the state have a duty to preserve the evidence; and
(3)  if there was a duty to preserve, was that duty breached, and what consequences should flow from the breach.[67]

In evaluating the third factor, a reviewing court must then

draw a balance between the nature of the State's conduct and the degree of prejudice to the accused.  The State must justify the conduct of the police or prosecutor, and the defendant must show how his defense was impaired by loss of the evidence.  In general terms, the court should consider: '(1) the degree of negligence or bad faith involved, (2) the importance of the lost evidence, and (3) the sufficiency of the other evidence adduced at the trial to sustain the conviction.'[68]

Because we conclude that Soffar has inadequately briefed this point of error, we need

not decide today whether the *Pena* court's understanding of the rights extended by Texas's

due-course-of-law provision is correct.  In his brief, Soffar relies heavily on *Pena*'s rejection

of the bad-faith requirement; however, beyond that, Soffar has failed to marshal the facts of

---

[64]  *Id.*

[65]  *Id.*

[66]  *Id.* at 653.

[67]  *Id.* at 651 (quoting *Deberry v. State*, 457 A.2d 744, 750 (Del. 1983)).

[68]  *Id.* (quoting *Deberry*, 457 A.2d at 752) (internal citations omitted).

his case under the balancing test adopted by the *Pena* court. Soffar also fails to assert that the constitutional harm standard is satisfied.[69] Under these circumstances, we conclude that Soffar has inadequately briefed his due-course-of-law claim according to the legal standard that he advances. We therefore overrule Soffar's point of error six (b) based on inadequate briefing.[70]

### Confrontation Clause

In his ninth point of error, Soffar asserts that the admission of Lawrence Bryant's prior testimony violated his rights under the Sixth Amendment's Confrontation Clause. Bryant, who testified at Soffar's 1981 trial, was deceased at the time of Soffar's retrial, so the State read his prior testimony into the record. Soffar alleges that his confrontation rights were violated because he was represented by constitutionally ineffective counsel who failed to adequately cross-examine Bryant at the first trial. He points to *Soffar v. Dretke*, in which the Fifth Circuit Court of Appeals held that Soffar's trial counsel rendered ineffective assistance by failing to interview and call Garner to testify or introduce his transcribed statements and failing to consult a ballistics expert of their own to reconstruct the crime scenario for the jury in accord with Garner's testimony or statements.[71] He argues that his attorney at his first trial

---

[69] *Id.* at 655 (applying harm analysis under Texas Rule of Appellate Procedure 44.2(a)). *But see Youngblood*, 488 U.S. at 60 (Stevens, J., concurring) (observing that materiality "'must be evaluated in the context of the entire record.'") (citations omitted).

[70] T EX. R. APP. P. 38.1(h).

[71] 368 F.3d at 479.

should have questioned Bryant more thoroughly to reveal inconsistencies between Garner's and Soffar's versions of events.  In support of his claim, Soffar relies on our opinion in *Russell v. State*.[72]  In that case, we held that Russell's confrontation rights were violated by the admission of an unavailable witness's prior testimony that had been given at Russell's examining trial.[73]  We determined that Russell's counsel did not have the ability to adequately cross-examine the witness at the examining trial because cross-examination had been restricted.[74]  In reaching our determination, we said that whether the "requisite opportunity existed" for cross-examination depends upon the "surrounding circumstances."  One factor to be considered and "may appear from time to time to be significantly weighty" is the "intimation of ineffective assistance of counsel."[75]

In *Crawford v. Washington*, the United States Supreme Court held that testimonial hearsay may be admitted into evidence against a defendant only if the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the declarant.[76]

We hold that this case does not fall within the class of cases that we alluded to in

---

[72]  604 S.W.2d 914 (Tex. Crim. App. 1980).

[73]  *Id.* at 922-26.

[74]  *Id.* at 922-23.

[75]  *Id.* at 921; *see also Ohio v. Roberts*, 448 U.S. 56, 73 n.12 (1980) (observing that, when evaluating a prior opportunity for cross-examination, an inquiry into the effectiveness of counsel during the prior proceeding may be required where a court previously found that counsel rendered ineffective assistance at the prior proceeding).

[76]  541 U.S. 36, 59 (2004).

*Russell.* First, we observe that the Fifth Circuit did not hold that Soffar's attorney was ineffective for failing to adequately cross-examine Bryant at Soffar's first trial.[77] In our view, it would be improper to conclude that Soffar's first trial attorneys, found to have rendered deficient performance at a particular point during that trial, were therefore deficient in all other respects during that trial.

Notably, in Soffar's state application for a writ of habeas corpus challenging his first capital-murder conviction and death sentence for this offense, Soffar challenged his trial attorneys' performance with respect to Bryant's testimony. He claimed that his attorneys failed to investigate, develop, or present evidence that his statement to Bryant was unreliable. In denying Soffar's application on the findings of the trial court, we rejected this claim. Thus, with respect to counsels' treatment of Bryant at Soffar's first trial, we concluded that Soffar failed to prove deficient performance and resulting prejudice. The Fifth Circuit did not disturb this holding, and we see no reason to reconsider our prior decision here.

However, even if we were to construe Soffar's prior habeas claim as not including the particular underlying ineffective assistance claim at issue here, we would conclude that Soffar has not shown that his attorney performed deficiently when questioning Bryant. That Soffar's appellate attorneys would have pursued a different line of questioning or conducted more extensive questioning does not support a finding that Soffar's first trial attorneys were

---

[77] *Soffar*, 368 F.3d at 480.

deficient.[78] Thus, the Confrontation Clause is not violated "simply because the defendant did not conduct a particular form of cross-examination that in hindsight might have been more effective."[79]

Here, as required by the Confrontation Clause, Soffar had a prior opportunity to cross-examine Bryant at his first trial. Point of error nine is overruled.

### Admissibility of Soffar's Statements

In point of error ten, Soffar makes various challenges to the admissibility of the statements that he gave to police on August 5, 1980. In point of error ten (a), he asserts that the police violated his Fifth Amendment rights by continuing their custodial interrogation after he invoked his right to remain silent. In point of error ten (b), he asserts that Sergeant Clawson's misleading answers to Soffar's questions rendered invalid any purported waiver of his right to counsel. In point of error ten (c), he complains that the police obtained his statements by failing to honor his invocation of the right to counsel under the Fifth Amendment. In point of error ten (d), he asserts, "Under Texas law, the police were required to clarify whether Soffar wanted counsel, if his invocation was ambiguous." Finally, in point of error ten (e), he claims that his statements were involuntary.

Soffar was arrested by League City Police Officer Raymond Willoughby on August 5, 1980, for theft of a motorcycle. Willoughby noticed that Soffar's eyes were bloodshot, his

---

[78] *See Ex parte Ellis*, 233 S.W.3d 324, 331 (Tex. Crim. App. 2007).

[79] *People v. Carter*, 117 P.3d 476, 515 (Cal. 2005); *see also People v. Wilson*, 114 P.3d 758, 782 (Cal. 2005).

speech was slurred, and that he smelled of alcohol. Willoughby read Soffar his *Miranda* rights, and Soffar told Willoughby that he understood his rights. Willoughby believed that Soffar understood his rights and that his judgment was not impaired, even though he thought that Soffar was intoxicated. Detective Palmire from the Friendswood City Police Department came to the scene and spoke to Soffar after warning him. Soffar told Palmire, "I'm not going to the penitentiary for any dam [sic] bike. You'd better check Houston for bigger things." When Palmire inquired further, Soffar wouldn't say anything else. Palmire did not believe that Soffar was under the influence of drugs or alcohol.

While Willoughby was transporting Soffar to the police department, Soffar told Willoughby that he would not be going to prison for theft of a motorcycle but would be going for "something bigger." Soffar then told Willoughby that he had information about the bowling-alley murders in Houston and asked Willoughby to contact Sergeant Clawson, who was a member of the Galveston County Sheriff's Office. Beginning in 1979, Soffar acted as a paid drug informant for Clawson. Clawson usually saw Soffar on a weekly basis, and he believed that Soffar trusted him and, perhaps, regarded him as a friend. Clawson formed the impression that Soffar had a poor sense of reality and was impulsive, child-like, and eager to please law enforcement.

After Willoughby and Soffar arrived at the League City Police Department, Willoughby told Lieutent Steve Johnson about Soffar's request to talk to Clawson. Johnson called Clawson, and Clawson came to the League City Police Department. Clawson gave

Soffar his *Miranda* warnings. Shortly thereafter, Willoughby, Johnson, and Clawson escorted Soffar to the municipal court so that Soffar could receive warnings from a magistrate. Soffar did not have any questions about the magistrate's warnings and indicated that he understood them. When they returned to the police department, Clawson talked to Soffar a little about the murders. Clawson believed that he was brought in to provide Soffar with a friendly face and to "hold [his] hand during the course of the interrogation."

While Clawson spoke to Soffar, Detective Gil Schultz from the Houston Police Department arrived at the station. After reading Soffar his *Miranda* rights, Schultz interviewed Soffar about the bowling alley murders, and after learning some basic information about the offense, Schultz called Terry Wilson, an assistant district attorney with the Harris County District Attorney's Office, and requested his assistance. When Wilson arrived, with Schultz present, Wilson warned Soffar per *Miranda* and questioned him about the murders. According to Wilson, the interview was brief; Schultz told him that Soffar did not want to talk to him anymore because Soffar did not like Wilson. Wilson did not construe Soffar's refusal to talk to him as an invocation of his right to remain silent; it was because Soffar personally disliked him. Wilson was told that Soffar said, "Keep that four-eyed MF away from me." Soffar also informed Clawson that he did not want to talk to Wilson, and Clawson believed that it was because Soffar "did not like" Wilson. And sometime earlier, Soffar had told Clawson that he did not want to talk to Palmire. Clawson believed that Soffar had a "personal problem" with Palmire, which Soffar had conveyed in a "graphic manner."

Schultz and Clawson then spoke to Soffar, though Clawson left the room at some point. Schultz later came out and found Clawson and told him that Soffar wanted to talk to him again. Clawson believed that Schultz sought his assistance because Schultz had "hit a "brick wall" with Soffar. When Clawson spoke to Soffar, he noticed that he was nervous. Soffar asked Clawson how long it would take to get an appointed attorney in Harris County. Responding, Clawson said: "a day, a week, a month." He did not know how the system worked in Harris County. Soffar also asked Clawson if he should get a lawyer. Clawson told Soffar, "Well, if you're guilty you should talk to police and if you're not guilty you should get an attorney." Clawson also told Soffar that this was "serious." Soffar asked Clawson if he was on his own, and Clawson told him that he was. Clawson viewed the exchange as Soffar's acknowledgment that Clawson could not help him this time, even though Clawson had helped him with previous charges. Clawson did not interpret Soffar's question about a lawyer as a request for counsel. Clawson then asked Soffar if he wanted to talk to Schultz again, and Soffar said that he did.

Soffar later gave a signed written statement to Schultz. Schultz stated that Soffar had told him that he had used drugs earlier that day, but Shultz observed that Soffar did not appear to be under the influence of drugs or alcohol.

In point of error ten (a), Soffar contends that Clawson continued to interrogate him after he invoked his Fifth Amendment right to remain silent. He claims that the trial judge should have suppressed his written statement. We disagree. Soffar's refusal to speak to

Wilson and Palmire did not amount to an unambiguous assertion of his right to remain silent.[80]

It would have been appropriate for the trial judge to find that Soffar merely asserted his preference to avoid speaking to two law-enforcement officials whom he personally disliked. Point of error ten (a) is overruled.

In point of error ten (b), Soffar claims that, because of Clawson's misleading responses to his inquiry about hiring an attorney, his waiver of his Fifth Amendment right to counsel was invalid. The United States Court of Appeals for the Fifth Circuit addressed the merits of this claim when Soffar sought federal habeas relief following his first conviction and sentence of death for this offense. The material portions of the evidence pertaining to Soffar's current allegation are the same as they were when the Fifth Circuit rejected this claim, and we agree with the Fifth Circuit's resolution of that claim.[81] Therefore, we overrule point of error ten (b).

In point of error ten (c), Soffar alleges that his Fifth Amendment right to counsel was violated because, when talking to Clawson, he invoked his right to counsel. We disagree. Based on the facts before us, we conclude that Soffar's questions to Clawson about hiring an attorney did not amount to an unambiguous or unequivocal request for counsel.[82] As noted by

---

[80] *Dowthitt v. State*, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996) ("an officer need not stop his questioning unless the suspect's invocation of rights is unambiguous . . . .").

[81] *Soffar*, 300 F.3d at 596-97.

[82] *Davis v. United States*, 512 U.S. 452, 459 (1994).

the Fifth Circuit Court of Appeals, the substance of each specific inquiry made by Soffar has been rejected as a clear invocation of the right to counsel,[83] and we agree with this determination.[84] We therefore overrule point of error ten (c).

In point of error ten (d), Soffar urges us to hold that, under Texas law, the police were required to clarify whether Soffar wanted counsel if his invocation was ambiguous. Soffar fails to demonstrate that his Texas-law claim was properly preserved at trial.[85] We cannot find, and Soffar fails to point us to, anything in the record indicating that he argued that Texas law provides greater protection than the Fifth Amendment.[86] Point of error ten (d) is therefore overruled.

In point of error ten (e), Soffar claims that his statements were involuntary for various reasons. For instance, Soffar claims that he had a "child-like" mentality, that he was misled about his right to counsel by Clawson, and that he was intoxicated when he was arrested. The determination as to whether a confession was given voluntarily must be analyzed by

---

[83] *Soffar*, 300 F.3d at 595.

[84] *Russell v. State*, 727 S.W.2d 573, 576 (Tex. Crim. App. 1987) ("appellant's inquiry into the officer's opinion as to the necessity of counsel being present during interrogation cannot be viewed as a *clear* invocation of his right to counsel . . . .") (emphasis in original); *Collins v. State*, 727 S.W.2d 565, 569-70 (Tex. Crim. App. 1987) (holding that appellant's inquiry as to whether he would receive counsel was not an invocation of the appellant's right to counsel).

[85] *See Pena*, 285 S.W.3d at 464.

[86] *Id.*

examining the "totality of the circumstances."[87]

The evidence at the suppression hearing did not establish that Soffar's statements were involuntary because of intoxication. Although Willoughby testified that Soffar seemed to be "somewhat intoxicated," he did not believe that Soffar was intoxicated "to the point that he would not have understood his rights or the circumstances that he was in at the moment." Palmire, Clawson, and Schultz testified that Soffar did not appear to be under the influence of alcohol or drugs. And all of these witnesses testified that Soffar appeared to understand the warnings, which were repeated numerous times, and that he was not subjected to any threats or promises when interrogated. Under the totality of the circumstances, the trial judge did not abuse her discretion in finding that Soffar's statements were voluntary. Point of error ten (e) is therefore overruled.

### Admission of Oral Statements

In point of error eleven, Soffar claims that the trial judge erroneously admitted his oral statements in violation of Article 38.22, Texas Code of Criminal Procedure, because they were not recorded. He specifically refers to statements that he made while riding around to various locations in Houston with Detectives Ladd and Williamson on the afternoon of August 6th. Ladd testified about the these statements on direct examination at the suppression hearing:

Q. All right. And where - - what was the purpose of leaving the

---

[87] *Delao v. State*, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007) (citing *Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991)).

homicide office?

A.     For Max to point out some of the locations that he had been talking about to go to the bowling alleys and look at them and to try to find Pops there who they brought [sic] dope from.

Q.     Okay. And so after you left the homicide office were you in one of the unmarked police cars?

A.     We were.

Q.     And do you remember who was driving and who was the passenger?

A.     I don't recall if I drove or Detective Williamson drove[,] whichever wasn't driving was in the back seat with Max.

Q.     Okay. And where did you first go then after leaving the homicide office?

A.     First went to Fair Lanes Bowling Alley on Bunker Hill just south of I-10. There was another Fair Lanes there that had a robbery.

Q.     When you went to the Fair Lanes Bowling Alley on I-10 what did you -- when you arrived at the location what did you do?

A.     We just let [Soffar] -- where we were at and let him comment on the location that we were at since we were not at the location where the murders had happened but a different bowling alley all together [sic] so we just wanted to see what his reaction would be to where we were at.

Q.     Okay. Now had you discussed with [Soffar] where you were going?

A.     No.

Q.     Prior to your arriving at the bowling alley off of I-10?

A.     No.

Q.     When you arrived at the bowling alley on I-10 did you ask him any questions?

A.     No.

Q.     When you pulled into the parking lot what, if anything, did the Defendant say?

A.     He looked around.

[DEFENSE COUNSEL]:  Your Honor, we would object to any oral statements that have not been reduced to writing.  38.22 Code of Criminal Procedure.

THE COURT:  Overruled.

A.     Looked around at this location and just remarked to us that this did not look like the right place.

. . .

Q.     After the Defendant had made the statement that this didn't look right where did you go then?

A.     We then proceeded to the Fair Lanes Bowling Alley on Northwest Freeway.

Q.     Okay.  And did you tell the Defendant where you were going at that time?

A.     No.

Q.     And when he arrived at the Fair Lanes Bowling Alley off 290 what did you do?

A.     Same thing as previous just pulled into the parking lot let [Soffar] look at the surroundings and the front of this bowling alley and just to see what his reaction would be.

Q.      And what was his reaction?

A.      He said this looked right.

[DEFENSE COUNSEL]:  Your Honor, again I would object to any statement not reduced to writing in accordance with Article 38.22.

THE COURT:  Overruled.

THE WITNESS:  This looked like the correct location.

Article 38.22, Section 3(a)(1) provides that "[n]o oral . . . statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding" unless, among other things, an electronic recording of the statement is made.[88]  A defendant is "in custody" if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest.[89] This is the situation here.  Thus, we hold that Soffar was in custody for purposes of Article 38.22 when he made the statements.

"Interrogation" is defined as any words or actions by the police that they should have known are reasonably likely to elicit an incriminating response.[90]  Ladd testified that they left the homicide office with Soffar so that he could "point out some of the locations that he had been talking about to go to the bowling alleys and look at them and to try to find Pops," and

---

[88] T EX. CODE CRIM. PROC. ANN. art. 38.22 § 3(a)(1).

[89]  *Stansbury v. California*, 511 U.S. 318, 322 (1994).

[90]  *Rhode Island v. Innis*, 446 U.S. 291, 302 (1980).

that they drove Soffar to a different bowling alley "to see what his reaction would be." We conclude that these actions were designed to elicit an incriminating response from Soffar, and the trial judge should have ruled that evidence was inadmissible. However, the error was harmless because the admission of Soffar's incriminating oral statements, in light of Soffar's other confessions, including those to Bryant and Cass, did not affect Soffar's substantial rights.[91] Accordingly, point of error eleven is overruled.

## Guilt-Phase Jury Argument

Soffar claims that some of the prosecutor's closing arguments violated his constitutional right to due process of law and to a fair trial. First, he asserts that the prosecutor improperly argued that Soffar's confession was credible because he knew details known only to the perpetrator. Second, he claims that the prosecutor improperly argued that the defense failed to produce any evidence that someone other than Soffar committed the crime. Third, he contends that the prosecutor improperly argued that the defense failed to produce any evidence that Soffar's confession was false. He claims that, in making these arguments, the prosecutor impermissibly shifted the burden of proof and improperly commented on his failure to testify. Soffar failed to object in any of these instances; thus, he failed to preserve these particular arguments for review.[92]

Soffar also contends that the prosecutor misled the jury by arguing that his commitment

---

[91] T EX. R. APP. P. 44.2(b).

[92] T EX. R. APP. P. 33.1.

to the Austin State Mental Hospital was a criminal commitment instead of a civil commitment. However, when defense counsel objected to this argument at trial, she simply stated, "Objection Your Honor. Burden shifting." Soffar's "burden shifting" trial objection does not comport with his argument on appeal; therefore, he has failed to preserve his complaint for our review,[93] and we overrule his twelfth point of error.

## Charge on Guilt

In point of error thirteen, Soffar challenges the trial judge's failure to properly instruct the jury about the statements he made to police. In point of error thirteen (a), Soffar contends that the trial judge erroneously refused to instruct the jury under Section 7, Article 38.22, Texas Code of Criminal Procedure, to disregard his confession "if the State failed to prove he waived his right to remain silent and to counsel during custodial interrogation."[94] Soffar maintains that Sergeant Clawson's testimony raised the issue as to the validity of these two waivers. At trial, Soffar requested that the following instruction be included in the charge:

> If you are not convinced beyond a reasonable doubt that prior to and during the making of any statement, . . . Soffar knowingly, voluntarily and intelligently waived his right to remain silent and not to make any statements at all, and the right to have a lawyer present to advise him prior to or during any questioning, then you shall disregard the statements and you shall not consider any evidence obtained as a result of the statement.

The trial judge denied Soffar's request.

We conclude that the trial judge did not abuse her discretion because the issue was not

---

[93] *Id.*

[94] TEX. CODE CRIM. PROC. ANN. art. 38.22 § 7.

raised by the evidence.[95] There was no factual dispute over the relevant portions of Clawson's testimony for the jury to resolve. The relevant portions of Clawson's testimony were not affirmatively contested.[96] Therefore, the specific voluntariness issue raised only a question of law—something within the exclusive purview of the trial judge that was addressed and ruled on outside the jury's presence. The trial judge did not abuse her discretion in denying Soffar's requested instruction; therefore, point of error thirteen (a) is overruled.

In point of error thirteen (b), Soffar contends that the trial judge erroneously refused to instruct the jury to disregard his confession "if it found the confession untruthful." He argues that this instruction was warranted due to evidence of Soffar's overall lack of credibility, his false confessions to burglarizing the bowling alley the night before the robbery murders and to committing other robberies with Bloomfield, and the dramatic inconsistencies between his putative confession and the other evidence. None of the cases cited by Soffar hold that such an instruction is required.[97] The issue of Soffar's credibility was encompassed

---

[95] *Oursbourn v. State*, 259 S.W.3d 159, 176 (Tex. Crim. App. 2008) (for an issue to be raised by the evidence under Section 7 of Article 38.22, Texas Code of Criminal Procedure, "there must be a genuine factual dispute . . . .").

[96] *Cf. Oursbourn*, 259 S.W.3d at 176-77 (noting similarity in language between Article 38.22, Section 7, and Article 38.23 and stating that to establish a general factual dispute under Article 38.23, a defendant must show that: "(1) the evidence heard by the jury must raise an issue of fact; (2) the evidence on that fact must be contested; and (3) the contested factual issue must be material to the lawfulness of the challenged conduct in obtaining the statement claimed to be involuntary.").

[97] *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *United States v. Lewis*, 592 F.2d 1282, 1286 (5th Cir. 1979); *Myre v. State*, 545 S.W.2d 820, 825 (Tex. Crim. App. 1977); *Anzaldua v. State*, 502 S.W.2d 19, 23 (Tex. Crim. App. 1973).

in the charge on guilt; had the jury found his confession untruthful, it would have disregarded it. Point of error thirteen (b) is therefore overruled.

In points of error thirteen (c), Soffar contends that trial judge erred by denying his request to instruct jurors that they should disregard Soffar's confession if they found that it was involuntary due to intoxication. Soffar contends that the testimony of Officer Willoughby and Detective Schultz raised the issue. We conclude that there was no error. In this case, the general voluntariness instruction that Soffar received under Article 38.22, Section 6 adequately addressed the issue of involuntariness due to intoxication.[98] The issue of Soffar's intoxication was litigated before the jury, and the general voluntariness instruction informed the jurors not to consider Soffar's statements as evidence against him if they had a reasonable doubt as to whether it was made freely and voluntarily. Point of error thirteen (c) is therefore overruled.

In point of error thirteen (d), Soffar claims that the trial judge erroneously refused to instruct the jury, under Article 38.23, Texas Code of Criminal Procedure, to disregard his confession if it found that he was subjected to a verbal threat from a police officer. During Soffar's taped confession with Schultz, Soffar told Schultz that he received "a little verbal threat" from one of the officers at the Friendswood Police Department. Soffar also told Schultz that no one had physically beaten him.

Soffar failed to identify the particular officer who made the "little verbal threat" and

---

[98] *Oursbourn*, 259 S.W.3d at 176-77.

the law-enforcement officials who testified at Soffar's trial denied making any threat toward Soffar before he gave his statement to Schultz. Had Soffar identified the officer and that officer then testified that he did not verbally threaten Soffar, there would have been a factual dispute for the jury to resolve. That some unidentified officer verbally threatened Soffar was not affirmatively contested at trial. The exclusionary issue remained within the sole purview of the trial judge—a matter that was addressed during a suppression hearing outside the jury's presence. Thus, the trial judge did not abuse her discretion in denying Soffar's request for an Article 38.23 instruction, and we overrule point of error thirteen (d).

In point of error thirteen (e), Soffar alleges that the trial court judge refused to instruct the jury not to hold against Soffar any delay in prosecuting this case. In point of error thirteen (f), Soffar contends that the trial judge erroneously refused to instruct the jury that it could draw an adverse inference against the State if its explanation for losing important evidence was inadequate. Again, Soffar fails to cite any authority establishing that these instructions were required. Points of error thirteen (e) and (f) are overruled.

In point of error thirteen (g), Soffar complains about the trial judge's refusal to instruct the jury on the law of circumstantial evidence. He states that the jury was given a circumstantial-evidence charge at his 1981 trial. At trial in 2006, the judge denied Soffar's request for a circumstantial-evidence instruction. After Soffar's first trial, we abolished the requirement of a circumstantial-evidence instruction.[99] Soffar claims that, due to *ex post facto*

---

[99] *Hankins v. State*, 646 S.W.2d 191, 197 (Tex. Crim. App. 1983).

considerations, he is entitled to an instruction under the rule as it was in 1980, when the offense occurred. We see no *ex post facto* violation because the instruction given "did not subject [Soffar] to retroactive criminal prosecution" and "did not create a potentially more onerous punishment."[100] Point of error thirteen (g) is overruled.

## Exclusion of Mitigating Evidence

In points of error fourteen (a) and (b), Soffar alleges that the trial judge violated his right to present mitigating evidence under a residual doubt theory by precluding evidence that Paul Reid was responsible for the Fairlanes robbery murders. Citing *Oregon v. Guzek*, he argues that Eighth and Fourteenth Amendments grant him the right to introduce residual doubt evidence at punishment.[101] Alternatively, he alleges that we should hold, under Texas statutory and constitutional law, that residual-doubt evidence is admissible at the sentencing phase of a capital trial.

Soffar filed a "Motion to Submit Evidence and Argue Residual Doubt at the Penalty Phase," generally requesting that the trial judge allow him to re-submit, or offer new, evidence at the penalty phase casting doubt on his guilt and conviction and to instruct the jury to consider evidence introduced at the guilt and penalty phases as well as any residual doubts as factors mitigating against the imposition of the death penalty. Soffar does not refer to this motion on appeal. Instead, he complains about only the trial judge's ruling when defense

---

[100] *Davidson v. State*, 737 S.W.2d 942, 947 (Tex. App.—Amarillo 1987, pet. ref'd).

[101] 546 U.S. 517 (2006).

counsel attempted to call Jonathan Scott to testify at punishment about Paul Reid's alleged admissions to Stewart Cook. Soffar specifically complains about the trial judge's ruling:

> [DEFENSE COUNSEL]: And now the second issue that I wish to raise before the Court is that the statutory language regarding what the jury may consider at punishment says that they may consider circumstances of the offense and in this case there's been a real issue about first of all Paul Reid and his admission against penal interest to Stewart Cook and given Green versus Georgia's lowered standard of admissibility for mitigating evidence that can be placed before the jury I seek to put before the jury Jonathan Scott regarding the admission against penal interest so that the jury is aware of those issues as mitigating factors.
>
> THE COURT: My ruling will be the same at this phase of the trial with respect to the admissibility of Mr. Scott's testimony about what Mr. Cook said that Paul Reid said. I still am not going to admit that in the punishment phase of the trial.

Citing *Green v. Georgia*, defense counsel then continued to argue that "the State's hearsay rules should not be used to preclude any evidence that the Defendant wants to put on."[102] And citing *Wiggins v. Smith*, defense counsel also argued that "there is a lower standard of admissibility when evidence is proffered as mitigating evidence to the jury because anything can be mitigating."[103] Finally, relying on *Tennard v. Dretke*, defense counsel argued that "anything to justify [a] sentence of life is admissible."[104] The trial court judge stated that she would read the cases and added:

---

[102] 442 U.S. 95 (1979).

[103] 539 U.S. 510 (2003).

[104] 542 U.S. 274 (2004).

THE COURT: And I'll be happy to consider what they say but when you tell me that there's no hearsay objection at the punishment phase of the trial as evidence offered by the Defense I'm telling you I don't think that's what those cases say all right. Now if you're asking me to extrapolate and say well, you what they say X Y and Z and they also say A B and C. You know by now that I'm not going to do that[,] I'm not going to extrapolate and change and expand what the law is.

[DEFENSE COUNSEL]: I understand that Judge but the cite of - - we've cited these cases in good faith.

THE COURT: And that's fine.

. . .

THE COURT: But if they don't say what you just said that they say you can count on me making the same ruling in this phase of the trial as the first. Okay.

Soffar's trial arguments, which were ruled on by the trial judge, do not comport with Soffar's residual-doubt arguments on appeal. Thus, he has failed to preserve these complaints for our review.[105] And even if error were preserved, we conclude, as we did with respect to points of error one (a) and (b), that the trial judge did not abuse her discretion. Points of error fourteen (a) and fourteen (b) are overruled.

In point of error fourteen (c), Soffar alleges that the trial judge deprived him of his constitutional rights to present powerful mitigating evidence when it precluded the introduction of sworn affidavits from his mother, Zelda Soffar, and his maternal uncle, Carl Amdur, two witnesses who had died since the first trial. Soffar claims that Zelda's affidavit establishes that, had Zelda been alive for her son's retrial in 2006, she would have testified

---

[105] EX. R. APP. P. 33.1.

at the sentencing phase about Soffar's psychological, toxin-sniffing, and academic problems, important information that ineffective counsel did not elicit in the first trial.  He contends that Amdur's affidavit establishes that he would have testified about Soffar's difficult upbringing, psychological problems, and toxin sniffing as a child.  Soffar complains that the trial judge's rigid application of the hearsay rule improperly prevented him from presenting this mitigating evidence.

The record shows that the mitigating evidence contained in the affidavits was presented from other sources at punishment.

Psychiatrist Susan Stone testified for the defense at length regarding Soffar's psychological, drug, academic, and family problems.  Stone opined that Soffar suffered from organic brain syndrome and attention-deficit hyperactivity disorder.  Stone testified that Soffar began ingesting pills and sniffing leaded gasoline at age four, that he began seeing a psychiatrist at age six, that he did not succeed socially or academically, that he was held back in the first and third grade, that he was committed to the Austin State Hospital after having a psychotic break at age twelve, that he was treated with psychotropic medication and shock therapy, and that he continued to receive psychiatric help after leaving the state hospital.  She further testified that Soffar's mother put barbiturates in his baby bottle to calm him as an infant and that his parents were unable to properly care for him and to meet his needs.

Thomas Busby, who worked at the Gulf Coast Trade School when Soffar lived there, testified that Soffar was academically behind and that he sniffed paint or paint thinner to get

high.

Jackie Butler, Soffar's sister, testified that their parents did not provide much guidance or discipline and that Soffar had a hard time learning. He began seeing a psychiatrist and taking medication when he was about six years old, sniffed glue and gasoline, and took their parents' pills to get attention.

The State also read a portion of Zelda's prior testimony into the record. In it, she stated that Soffar had mental problems starting at age six, that he had troubles in school, that he received psychiatric treatment for a period of about twelve years, that he sniffed glue and gasoline, and that he was committed to the state hospital after "[h]e had taken medication that set him off."

Based on the foregoing, even if we were to assume that the trial judge erred in excluding the affidavits, any error was harmless in light of the other evidence that was admitted.[106] Point of error fourteen (c) is overruled.

In point of error fourteen (d), Soffar complains that the trial judge repeatedly made evidentiary rulings that blocked his attempts to present mitigating evidence. In his brief, he lists twenty instances in which the trial judge sustained the State's objections or declined to admit defense evidence. However, in his brief, he fails to explain the specific objections that were made or the reasons that the trial judge's rulings were erroneous. Without more, these

---

[106] *See Halprin v. State*, 170 S.W.3d 111, 116 (Tex. Crim. App. 2005) (concluding exclusion of evidence was harmless when the same type of evidence was presented from other sources).

claims are inadequately briefed.[107]  Point of error fourteen (d) is overruled.

## Victim-Impact Testimony

In point of error fifteen, Soffar argues that the trial judge improperly allowed victim-impact testimony about a person not named in the indictment.  He specifically complains about the testimony of Sims's widow, Brenda Sims Moebius.  Before Moebius took the stand, the following exchange occurred during a bench conference:

> [DEFENSE COUNSEL]:  Judge, we would move in limine to prevent an improper victim impact testimony from any of the - - I assume it's victim impact witnesses coming.  We want to make sure that there is no victim worth testimony comparison to [the] life of one person over another or asking for a particular sentence from any of these.
>
> THE COURT:  Okay.

Moebius then testified about her life with Sims and their son before Sims was murdered, about how his death affected them, about being in shock when she was making Sims's funeral arrangements, and about being unable to face the first Christmas after Sims's death.  When the prosecutor offered family photographs into evidence, defense counsel asked to approach the bench and the following exchange occurred:

> [DEFENSE COUNSEL]:  Your Honor, Mr. Soffar is charged in the indictment with the death of Alane Felsher not charged with the murder of Steven Alan Sims so I think this line of testimony is improper and we would object to the introduction of these photographs and any additional testimony from this particular witness.
>
> THE COURT:  Overruled.

---

[107]  TEX. R. APP. P. 38.1(h).

[DEFENSE COUNSEL]: No objection Your Honor.

THE COURT: They're admitted.

Moebius then testified that Sims was a kind, fun-loving person, that he played sports in high school, that he was "not only [her] husband but [her] best friend," and that he was a very active and involved parent to his son.

A motion in limine is a preliminary matter and normally preserves nothing for appellate review.[108] For error to be preserved with regard to the subject of a motion in limine, an objection must be made at the time the subject is raised during trial.[109] Here, Soffar failed to make a timely objection as required by Rule 33.1 of the Texas Rules of Appellate Procedure. Defense counsel did not ask to approach the bench until Moebius had already testified at length regarding the impact of Sims's death on her and their son. And even if we determined that Soffar lodged a timely objection, we would still conclude that error is not preserved because Soffar never obtained a ruling from the trial judge about the victim-impact testimony. The trial judge only ruled on Soffar's objection to the admission of Sims's family photos. Soffar has failed to preserve this argument for appellate review, and we therefore overrule his fifteenth point of error.

**Punishment Charge**

In point of error sixteen (a), Soffar complains that the trial judge erred by refusing to

---

[108] *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008).

[109] *Id.*

instruct the jury that it must give weight to the mitigating circumstances they found. He further complains that the trial judge erroneously instructed the jury, "If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any . . . ." And in point of error sixteen (b), Soffar asserts that the trial judge erroneously instructed jurors that they had discretion to decide whether a circumstance was mitigating.

The law does not require a juror to consider any particular piece of evidence as mitigating.[110] The law requires only that a defendant be allowed to present relevant, mitigating evidence and that the jury be provided a vehicle to give mitigating effect to that evidence if the jury finds it to be mitigating.[111] Points of error sixteen (a) and (b) are overruled.

In point of error sixteen (c), Soffar argues that the trial judge erroneously instructed the jury that at least ten votes were required for the jury to return an affirmative answer on the mitigation issue. We have previously rejected this claim.[112] Point of error sixteen (c) is overruled.

In point of error sixteen (d), Soffar contends that the trial judge improperly instructed the jury that its answers to the special issues hould reflect an individualized determination by

---

[110] *Raby v. State*, 970 S.W.2d 1, 3 (Tex. Crim. App. 1998) (citing *Green v. State,* 912 S.W.2d 189 (Tex. Crim. App. 1995)).

[111] *Id.*

[112] *Busby v. State*, 253 S.W.3d 661, 667 (Tex. Crim. App. 2008); *Resendiz v. State*, 112 S.W.3d 541, 548-49 (Tex. Crim. App. 2003).

each juror of the personal culpability of the defendant. He argues that this instruction lessened the State's burden to prove the deliberateness, anti-parties, and future dangerousness special issues beyond a reasonable doubt. He further contends that the instruction infected the jury's deliberative process with an issue extraneous to the statute and allowed consideration of irrelevant evidence.

Soffar has not shown that his constitutional rights were violated. The United States Supreme Court has held that a state capital-sentencing system must "permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime."[113] And we have read our statute as incorporating this requirement.[114] Point of error sixteen (d) is overruled.

In point of error sixteen (e), Soffar alleges that the trial judge erred by denying his written and oral objections to the court's charge and verdict form on the ground that the indictment did not allege special issues one, two, and three. We have repeatedly held that the State is not required to allege the special issues in the indictment.[115] Point of error sixteen (e) is overruled.

In point of error sixteen (f), Soffar alleges that the trial judge improperly instructed the jury that it had to find beyond a reasonable doubt a reasonable probability that the defendant

---

[113] *Kansas v. Marsh*, 548 U.S. 163, 173-74 (2006).

[114] *See Mosley v. State*, 983 S.W.2d 249, 264 (Tex. Crim. App. 1998).

[115] *Russeau v. State*, 171 S.W.3d 871, 885-86 (Tex. Crim. App. 2005); *Rayford v. State*, 125 S.W.3d 521, 533 (Tex. Crim. App. 2003).

would commit criminal acts of violence that would constitute a threat to society. Soffar contends that use of the term "probability" was improper because it substantially diluted the State's burden of proving this issue beyond a reasonable doubt. We have previously rejected this claim,[116] and Soffar offers no reason for us to reconsider it here. Point of error sixteen (f) is overruled.

In point of error sixteen (g), Soffar complains that the trial judge erred by failing to instruct the jury to disregard victim impact evidence not shown to be within the knowledge or reasonable expectation of the defendant. Again, we have previously rejected this argument.[117] Point of error sixteen (g) is overruled.

In point of error sixteen (h), Soffar alleges that the trial judge erred by refusing to charge on residual doubt as mitigating evidence. We have previously held that there is no constitutional right to a jury instruction regarding residual doubt,[118] and this determination is not inconsistent with the United States Supreme Court's decision in *Oregon v. Guzek*.[119] Point of error sixteen (h) is overruled.

**Punishment Verdict**

In point of error seventeen, Soffar complains that the trial judge improperly

---

[116] *Rayford*, 125 S.W.3d at 534.

[117] *Roberts v. State*, 220 S.W.3d 521, 531-32 (Tex. Crim. App. 2007).

[118] *Gallo v. State*, 239 S.W.3d 757, 779 (Tex. Crim. App. 2007), *cert. denied*, 128 S. Ct. 2872 (2008).

[119] 546 U.S. 517, 523 (2006).

reassembled the jury to render a verdict after dismissal.  In point of error seventeen (a), he complains that this was reversible error under common law and case law.  In point of error seventeen (b), he contends that the trial judge violated his federal and state constitutional rights to due process of law, to be free of cruel and unusual punishment and against double jeopardy.  In point of error seventeen (c), he alternatively alleges that this Court should order an evidentiary hearing on any facts it deems in dispute and dispositive of the issue.

After the jury deliberated on punishment and returned to the courtroom, the foreperson handed the verdict to the bailiff and the trial judge read the verdict, stating in pertinent part as follows:

Special Issue No. 1.  We, the jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is yes.

Signed by the presiding juror.

Special Issue No. 2.  We, the jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is yes.

Signed by the presiding juror.

Special Issue No. 3.  We, the jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is yes.

Signed by the presiding juror.

Special Issue No. 4.  We, the jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is no.

Signed by the presiding juror.

The trial judge then polled the jurors, and they stated that the verdict was unanimous.  The

trial judge then sentenced Soffar to death and excused the jury.  After the jury was excused, the trial judge called the attorneys to the bench and stated, "I didn't turn to the last page and he didn't sign the last page."  The following then transpired:

[PROSECUTOR]:  I assume you'll send it back.

[DEFENSE COUNSEL]:  They have been released.

[PROSECUTOR]:  But they're back in the jury room and I believe that proper procedure would be to tell the bailiff not to let them go.

THE COURT:  Don't let them go yet.

Okay.  I think I will bring them back out and instruct them that they need to sign the last page if this is their verdicts [sic].

They've been polled though.

[PROSECUTOR]:  I would ask that you bring them back out and send it back with them to the jury room.

[DEFENSE COUNSEL]:  Please note our objection to that Your Honor.

THE COURT:  Yes, ma'am.

Would you ask them to come back out.

(Jury Seated).

THE COURT: Everybody be seated please.  I'm sorry but I didn't turn to the last page of the verdict form and it must be signed also, if this is indeed your verdict.  So if I could send you back with instructions to complete the paperwork I would appreciate it.

FOREPERSON:  Okay.

. . .

(Jury Seated).

THE COURT: Everybody can be seated and will you hand the paperwork to Deputy Seigel. And you have signed the final page? Thank you again for your service and ya'll truly are free to go now. Thank you.

Citing *Webber v. State*[120] and *West v. State*,[121] Soffar alleges that the trial judge was not authorized to recall the jury in order to correct their verdict.

In *Webber,* the issue was whether the jury recommended probation.[122] The foreman signed the blank on the verdict form showing that punishment had been probated, but the jury informed the trial judge after being excused that probation was not their intent.[123]

In *West,* the issue was whether the jury found the defendant guilty.[124] The foreman signed the verdict sheet indicating a guilty verdict, but the trial judge discovered, after the jury was excused, that the foreman had also signed the verdict sheet indicated a not-guilty verdict.[125]

These cases stand for the proposition that a judge is not authorized to recall the jury

---

[120] 652 S.W.2d 781 (Tex. Crim. App. 1983).

[121] 340 S.W.2d 813 (Tex. Crim. App. 1960).

[122] 652 S.W.2d at 782.

[123] *Id.*

[124] *West*, 340 S.W.2d at 814-15.

[125] *Id.*

after they have been discharged and have separated and have them correct their verdict.[126] However, a momentary separation of the jury from the presence of the judge will not preclude the judge from recalling them to correct their verdict where it appears that no one talked to the jurors about the case.[127]

Even assuming that the trial judge erred by recalling the jury after they had been excused and had momentarily gone back to the jury room, Soffar cannot demonstrate harm.[128] There was no uncertainty regarding the jury's intent in answering the special issues. Jurors were polled prior to being excused, and they clearly indicated that their verdict was unanimous. They needed only to memorialize their informal verdict with the simple addition of the foreman's signature on the last page.[129] Soffar's substantial rights were not affected by the jury doing so.[130] Because the record does not show harm, there is no need for this Court to abate the appeal.

We further hold that Soffar failed to preserve his constitutional claims regarding due process, cruel and unusual punishment, and double jeopardy. Soffar failed to object on these bases at trial.[131] Points of error seventeen (a), seventeen (b), and seventeen (c) are overruled.

---

[126] *West*, 340 S.W.2d at 815; *Webber*, 652 S.W.2d at 782.

[127] *West*, 340 S.W.2d at 815; *Webber*, 652 S.W.2d at 782.

[128] TEX. R. APP. P. 44.2(b).

[129] *See* TEX. CODE CRIM. PROC. ANN. art. 37.10(a).

[130] TEX. R. APP. P. 44.2(b).

[131] TEX. R. APP. P. 33.1.

**Death-Penalty Procedure**

In point of error eighteen, Soffar alleges that the death penalty is imposed in an arbitrary, freakish and discriminatory manner. He asserts, "Prosecutors' unfettered, standardless and unreviewable discretion under Article 37.0711 violates equal protection, due process and the Eighth Amendment." We have rejected this claim in previous cases,[132] and Soffar offers no reason for us to reconsider our prior holdings. Point of error eighteen is overruled.

In point of nineteen, Soffar asserts, "The Eighth Amendment's Prohibition Against Cruel and Unusual Punishment and the Fourteenth Amendment's Due Process Clause Prohibit Max Soffar's Execution, Given that He Has Spent Close to Twenty-Five Years Awaiting it." We have previously rejected this type of claim.[133] "The present standards of decency do not deem cruel and unusual the delay occasioned while a condemned prisoner pursues direct appeals and collateral relief."[134] Point of error nineteen is overruled.

**Ineffective Assistance of Trial Counsel**

In point of error twenty, Soffar points to several instances in which he allegedly received ineffective assistance of counsel. First, he complains that counsel failed to object to the prosecutor's improper jury arguments, as described in point of error twelve. Second,

---

[132] *Gallo v. State*, 239 S.W.3d 757, 779-80 (Tex. Crim. App. 2007); *Threadgill v. State*, 146 S.W.3d 654, 671-72 (Tex. Crim. App. 2004); *Rayford*, 125 S.W.3d at 534.

[133] *Smith v. State,* 74 S.W.3d 868, 875-76 (Tex. Crim. App. 2002).

[134] *Id.* at 875.

he complains that counsel failed to object to the trial judge's instructions at issue in points of error sixteen (a), (b), and (d). Third, he claims that counsel failed to properly object to the trial judge's admission of his oral statements, as discussed in point of error eleven. Finally, he alleges that counsel failed to preserve his challenge to the legality of the grand jury, as set out in point of error five.

To prevail on a claim of ineffective assistance of counsel, Soffar must show (1) deficient performance and (2) prejudice.[135] To show deficient performance, he must prove, by a preponderance of the evidence, that counsel's representation fell below the standard of professional norms.[136] And to demonstrate prejudice, he must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.[137]

Appellate review of trial counsel's representation is highly deferential, and we presume that counsel's actions fell within the wide range of reasonable and professional assistance.[138] If the reasons for counsel's conduct do not appear in the record and there is at least the possibility that the conduct could have been grounded in legitimate trial strategy, we will defer to counsel's decisions and deny relief on an ineffective assistance claim on

---

[135] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[136] *Id.* at 688.

[137] *Id.* at 694.

[138] *Garza v. State*, 213 S.W.3d 338, 348 (Tex. Crim. App. 2007).

direct appeal.[139]

We first point out that we have addressed claims eleven and sixteen (a), (b), and (d) and have overruled them on their merits. Further, the reasons for counsel's conduct do not appear in the record. Therefore, there is at least the possibility that his conduct could have been part of a legitimate trial strategy. Without more, we must defer to counsel's decisions and deny relief.[140] Point of error twenty is overruled.

## Speedy Trial

In his twenty-second point of error, Soffar contends that his federal right to a speedy trial was violated because twenty-five years elapsed between his first trial in 1981, at which he received ineffective assistance of state-appointed counsel, and his retrial in 2006. He does not claim that he was denied his right to a speedy trial after the trial court's judgment was reversed. In relying on the twenty-five year delay, he contends that his retrial was fundamentally unfair because key defense witnesses died, important evidence was missing, and witnesses' memories had faded.

To determine whether a defendant's federal speedy-trial right has been violated, courts consider the following four factors: "Length of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."[141] The length of the delay

---

[139] *Id.*

[140] *Garza*, 213 S.W.3d at 348.

[141] *Barker v. Wingo*, 407 U.S. 514, 530 (1972).

is the "triggering mechanism."[142] "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."[143] We recently observed that a seventeen-month delay is presumptively prejudicial, while a four-month delay is not.[144]

The twenty-five years between his first trial and retrial is presumptively prejudicial, according to Soffar. In response to Soffar's calculation, the State contends that the time that Soffar prosecuted his appeal and sought state and federal habeas corpus relief should not be included in the speedy-trial analysis.

We agree with the State. Soffar's claim amounts to an assertion that he should have been prosecuted while incarcerated pursuant to a presumptively valid conviction.[145] This is illogical; any effort to retry Soffar while his appeal and post-conviction proceedings were underway would have run afoul of the Double Jeopardy Clause. Further, Soffar's claim that ineffective counsel at his first trial ultimately resulted in the denial of his right to a speedy trial is without merit. Soffar has not shown that the State in any way intended to deprive him of his right to a speedy trial when his first trial attorneys were appointed. Following Soffar's logic would undoubtedly lead to an absurd result—an individual whose conviction is later

---

[142] *Id.*

[143] *Id.*

[144] *Cantu v. State*, 253 S.W.3d 273, 281 (Tex. Crim. App. 2008).

[145] *Barker*, 407 U.S. at 527 (the State has the duty to bring a defendant to trial).

reversed may be immune from re-prosecution based on the denial of the right to a speedy trial.[146] Such a result would undermine the policy interests that have been preserved by the Supreme Court's interpretation of the Speedy Trial Clause— society's interest in prosecuting persons accused of crimes, "rather than granting them immunization because of legal error at a previous trial" and making it more probable that appellate courts will overturn convictions when necessary.[147]

So, in this case, we conclude that the speedy-trial clock began to run, at the earliest, on the date that Soffar's conviction and sentence were reversed. On December 8, 2004, following the Fifth Circuit's ruling, the federal district court ordered Soffar's release within 120 days of the order, unless the State began to retry Soffar or released him from custody within the 120-day time frame. Our decision to exclude the time before the December 8th final order in our length of delay analysis is consistent with Supreme Court precedent and decisions from other state appellate courts.[148] Because we conclude that the time period here is not presumptively prejudicial, we have no need to consider the remaining *Barker* factors.

---

[146] *Id.* at 522 (dismissal of indictment is the remedy when the right to a speedy trial is violated); *cf. United States v. Loud Hawk*, 474 U.S. 302, 316 (1986) ("A defendant who resorts to an interlocutory appeal normally should not be able to return to the district court to reap the reward of a dismissal for failure to receive a speedy trial.").

[147] *United States v. Ewell*, 383 U.S. 116, 121 (1966).

[148] *Id.* at 120-21; *State v. Smith*, 159 P.3d 531, 543-44 (Ariz. 2007); *Pelletier v. Warden*, 627 A.2d 1363, 1371 (Conn. App. 1993); *State v. Kula*, 579 N.W.2d 541, 546-48 (Neb. 1998); *see also Icgoren v. State*, 653 A.2d 972, 976-979 (Md. App. 1995); *State v. Ferguson*, 576 So.2d 1252, 1254 (Miss. 1991).

Soffar's twenty-second point of error is therefore overruled.

**Juror Excusals**

In point of error twenty-three, Soffar claims that the trial judge committed reversible error by denying his pretrial motion for the court to determine excusals rather than the clerk. The issue was raised in a pre-trial motion and addressed at a hearing. The trial judge denied the motion after the following exchange:

> [DEFENSE COUNSEL]:  The other aspect of this motion is for The Court [sic] to determine all excuses because we think that is the proper province of The Court [sic] rather than a clerk with all due respect over at the jury building deciding whether people should be let off from jury service.
>
> [PROSECUTOR]: My understanding is that the clerk doesn't decide that per se but it's a Judge over there.  Whenever they get ready to call a panel they ask for people who have excuses who may not have already used their excuses.  By the way that we have the system set up by electronic e-mailing or whatever they do.  I thought we had a Judge over there every morning that goes over and - - used to.
>
> THE COURT: We used to.  I don't know how we do it now.
>
> [DEFENSE COUNSEL]: Well, I can represent that I was called for jury service in August and unfortunately I never got out of the building[. ] [T]he process it was explained to us and as I observed it people who felt they were ineligible had a problem one way or the other were invited to go speak to the clerk at the window who then according to what we were told was passing on whether those people could leave and I will report that a number of them never came back.
>
> [PROSECUTOR]: If they have a statutory exemption and they just hadn't figured out how to use it prior to that time but I'm fairly confident that the clerk's not saying well I got a lot of things to do today, well heck go on home.

THE CLERK: From what I understand the procedure is that if they are exempt one of the exemptions is listed on there I think they do let those people go but if it's something else then they say you have to go to the Court and talk to the Judge there. That's my understanding.

Texas Code of Criminal Procedure, Article 35.03 provides that "the court shall then hear and determine excuses offered for not serving as a juror, including any claim of an exemption or a lack of qualification, and if the court considers the excuse sufficient, the court shall discharge the prospective juror or postpone the prospective juror's service to a date specified by the court, as appropriate."[149] However, "in a case other than a capital felony case, the court's designee may hear and determine an excuse offered for not serving as a juror, including any claim of an exemption or a lack of qualification."[150] Soffar contends that the trial judge violated Article 35.03 because the statute permits a court designee to grant excusals only "in a case other than a capital felony case."

In *Chambers v. State*, we construed this language "as referring to the distinction between a special venire and the formation of panels through a general assembly."[151] We rejected Chambers's claim, holding:

when viewed in the context of the jury formation process, we again cannot conclude that this language would prohibit the general assembly judge from designating personnel to make such decisions. This is because at the time the summoned jurors apply for excuses, they have not been assigned to any particular case. There is no way of knowing what kind of case the prospective

---

[149] T EX. CODE CRIM. PROC. ANN. art. 35.03 § 1.

[150] *Id.* at § 2.

[151] 903 S.W.2d 21, 30 (Tex. Crim. App. 1995).

jurors would subsequently be assigned to, capital or noncapital . . . In the case of a special venire called in a capital case, the trial judge cannot designate others to make decisions with respect to excuses. Here, the potential jurors who were granted excuses by court designees were general assembly veniremembers and were not assigned to appellant's or any particular case.[152]

It appears from the discussion at the pretrial hearing that Soffar was complaining about a court designee granting excuses to general-assembly veniremembers. Thus, under *Chambers*, this procedure did not violate Article 35.03.[153]

Soffar also alleges that the trial court's ruling violated his rights to be present at all critical stages of the trial and to have the petit jury selected from a venire that represents a fair cross-section of the community. Soffar generally raised these arguments in his written motion but failed to reurge them at the hearing on the motion.[154] And we have previously rejected constitutional challenges to a general-assembly judge ruling on veniremember excuses in a defendant's absence.[155] Point of error twenty-three is overruled.

### Juror Impanelment

In his twenty-fourth point of error, Soffar claims that the trial judge violated his federal and state constitutional rights—specifically the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 3, 10, 13, and 19 of the

---

[152] *Id.*

[153] *Id.*

[154] EX. R. APP. P. 33.1; *Swain v. State*, 181 S.W.3d 359, 365 (Tex. Crim. App. 2005).

[155] *Moore v. State*, 999 S.W.2d 385, 399 (Tex. Crim. App. 1999).

Texas Constitution—by denying his pretrial motion for separate juries at the guilt and penalty phases of his trial. Soffar maintains that two separate juries are necessary to prevent a "death qualification procedure processing effect," causing a single jury to unfairly presume guilt and focus solely on punishment. He also argues that the application of the death-qualification procedure to a jury determining guilt results in an unconstitutionally biased jury by excluding jurors opposed to capital punishment. He concludes that such categorical exclusion ultimately undermines public faith in the objectivity of the criminal-justice system.

Initially, we observe that Soffar does not explain how the protection afforded by the Texas Constitution differs from that of the federal constitution. Therefore, for the purposes of this appeal, we conclude that Soffar has inadequately briefed his state constitutional claim. Additionally, we recognize that the due-process considerations raised under the Fifth Amendment, which do not apply to the State, are identical to those under the Fourteenth Amendment.[156] The United States Supreme Court has rejected similar federal constitutional claims made under the Sixth and Fourteenth Amendments, and we have rejected the same under the Sixth, Eighth, and Fourteenth Amendments.[157] Point of error twenty-four is overruled.

### State's Challenges for Cause

---

[156] *Jimenez v. State*, 32 S.W.3d 233, 241-42 (Tex. Crim. App. 2000) (McCormick, P. J., concurring).

[157] *Buchanan v. Kentucky*, 483 U.S. 402, 414-18 (1987) (citing *Lockhart v. McCree*, 476 U.S. 162, 173-78 (1986)); *Ramos*, 934 S.W.2d at 366-69.

In points of error twenty-five (a) and (b), Soffar alleges that the trial judge erred in granting the State's challenges for cause against prospective jurors Jonni Lisy and Jeanne Rehfeld Klein. He argues that the challenges violate the legal standard established by *Witherspoon v. Illinois*, which allows the for-cause exclusion of jurors for their opposition to the death penalty only if those beliefs would prevent them from complying with applicable capital punishment procedures.[158] Soffar contends that, while both Lisy and Klein expressed objections to capital punishment, neither expressed an inability to comply with Texas death-penalty laws. He argues that granting the challenges violated his constitutional rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, Article I, Sections 10, 13, 15, and 19 of the Texas Constitution, and Article 1.05, Texas Code of Criminal Procedure.

When evaluating a trial judge's ruling to grant a challenge for cause, we accord considerable deference to the trial judge's ability to observe the prospective juror's demeanor and response.[159] As a result, "we will reverse such a decision only for clear abuse of discretion; i.e., only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree."[160]

The record reflects that, on six occasions, Lisy stated that she would require more than

---

[158] 391 U.S. 510, 523 n.21 (1968).

[159] *Segundo v. State*, 270 S.W.3d 79, 93 (Tex. Crim. App. 2008).

[160] *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992).

proof beyond a reasonable doubt to apply the death penalty. She consistently asserted her need to "believe without any doubt in my mind." Soffar contends that this heightened threshold constitutes desirable "residual doubt" appropriate for a juror in a capital trial. The Supreme Court, however, has explicitly denied the existence of a constitutional right to a heightened burden of proof in capital sentencing.[161] Further, a potential juror's imposition of a standard higher than beyond a reasonable doubt constitutes proper cause for the dismissal of that juror.[162] Point of error twenty-five (a) is therefore overruled.

We now examine Soffar's claim regarding prospective juror Klein. When first questioned by the prosecution, Klein was adamant that she could not impose the death penalty; she could not envision any circumstances that would warrant a death sentence. But when questioned by Soffar's counsel about each of the special issues individually, Klein indicated that she would be able to answer each of them. Klein reverted to her inability to impose the death penalty when the State questioned her a second time. She explained that she was a forgiving person and that knowing herself, she was unable to imagine a situation in which she would vote no to the mitigation special issue. She vacillated slightly when asked about putting her personal beliefs aside and evaluating only the evidence. In the end, based on the totality of her statements, we conclude that Klein appeared unable to foresee a situation in which death would be an appropriate punishment. Given Klein's personal opposition to

---

[161] *Franklin v. Lynaugh*, 487 U.S. 164, 188 (1988).

[162] *Chambers v. State*, 866 S.W.2d 9, 22 (Tex. Crim. App. 1993).

the death penalty and her vacillation, we conclude that the judge's decision to grant the State's challenge was well within the realm of reasonable disagreement. Point of error twenty-five (b) is therefore overruled.

## Expert Testimony

In points of error twenty-six (a) through (c), Soffar argues that the trial judge erred in admitting Dr. Gildenberg's testimony that Garner suffered from retrograde amnesia because it was unreliable and speculative, the State did not adequately prove his qualifications as an expert on memory loss, and the testimony was admitted for an improper purpose. Soffar contends that the admission of this testimony violated Texas Rule of Evidence 702 and his constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 13 and 19 of the Texas Constitution.

Regarding point of error twenty-six (a), Soffar objected to Dr. Gildenberg's testimony at the *Daubert*/*Kelly* hearing, arguing that Dr. Gildenberg should not be permitted to testify that Garner was diagnosed with retrograde amnesia. The trial judge overruled the objection and determined that the testimony would be admissible. However, when Dr. Gildenberg testified before the jury, he never testified that Garner suffered from retrograde amnesia. Indeed, in his brief, Soffar acknowledges this by stating, "At no point in the trial could or did Dr. Gildenberg testify as to Greg Garner's actual memory loss or the presence or degree of retrograde amnesia." We therefore overrule point of error twenty-six (a).

As for point of error twenty-six (b)—that the trial judge erred in ruling that Dr.

Gildenberg was qualified as an expert on potential memory loss—we conclude that this claim is not preserved. At no time did Soffar object to Dr. Gildenberg's qualifications to testify as an expert on potential memory loss.[163]

Finally, in claiming that the trial judge admitted Dr. Gildenberg's testimony for an improper purpose in point of error twenty-six (c), Soffar contends that Dr. Gildenberg's testimony amounted to an attack on Garner's credibility as a witness. Soffar failed to object to Dr. Gildenberg's testimony on this basis at trial with an explanation as to why it is improper. Therefore, his claim was not properly preserved.[164] Moreover, we see no error. Dr. Gildenberg never opined on Garner's credibility as a witness; therefore, Dr. Gildenberg's testimony did not intrude on the jury's role to assess the credibility of Garner's statements and testimony.[165]

### Sexual Assault Confession

Soffar requested and was appointed counsel on the capital-murder charge on August 8, 1980. Detective Bockel, with the Houston Sheriff's Officer, started investigating the crime after Ladd called and informed him that Soffar confessed to a sexual assault. Investigating the lead, Bockel contacted the victim, Caroline Knight, and interviewed Soffar while he was in custody for the capital-murder charge. At that time, without the assistance of counsel,

---

[163] EX. R. APP. P. 33.1.

[164] *Id.*

[165] *Compare with Yount v. State*, 872 S.W.2d 706, 712 (Tex. Crim. App. 1993); *Cohn v. State*, 849 S.W.2d 817, 819 (Tex. Crim. App. 1993).

Soffar executed a written statement confessing to the sexual assault. Soffar's statement was admitted into evidence during the punishment phase of Soffar's trial.

In points of error twenty-seven (a) and (b), Soffar contends that the trial judge erred in admitting his alleged confession to a sexual assault elicited in violation of his Fifth and Sixth Amendment rights, his rights under Article I, Sections 10, 13, and 19 of the Texas Constitution, and his rights under *Miranda v. Arizona*.[166] Soffar claims that, because his right to counsel had attached after he requested and was appointed counsel,[167] the confession obtained by the State without his lawyer present was erroneously used in the punishment phase of his murder trial.

First, we observe that Soffar does not explain how the protection afforded by the Texas Constitution differs from that of the federal constitution. As a result, Soffar's Texas constitutional claim is inadequately briefed.

The Sixth Amendment right to counsel attaches after adversarial judicial proceedings have begun,[168] and extends to all "critical stages" of criminal proceedings.[169] This includes interrogation.[170] The right is limited; it is "offense specific" and does not extend to all future

---

[166] 384 U.S. 436 (1966).

[167] *But see Montejo v. Louisiana*, 129 S. Ct. 2079 (2009).

[168] *Id*. at 2085.

[169] *Montejo*, 129 S. Ct. at 2085.

[170] *Id*.

prosecutions.[171]

Soffar was not charged with sexual assault when he was questioned by Bockel; thus, his right to counsel had not attached for that crime. Soffar argues, however, that his right to counsel for the capital-murder charge extended to the sexual-assault-offense confession because the confession was used by the State in the punishment phase to prove future dangerousness. Our decisions in *Wesbrook v. State*[172] and *Thompson v. State*[173] support Soffar's contention that the trial judge erred in admitting Soffar's confession to the sexual-assault offense into evidence. In those cases, the defendants, formally charged with capital murder and represented by counsel, were questioned by the State about extraneous, uncharged offenses without the assistance of counsel. At the punishment phase of the defendants' trials, the State used the incriminating information given by the defendants about the extraneous, uncharged offenses to prove that the defendants constituted a future danger. We held that the defendants' Sixth Amendment right to counsel was violated. In *Wesbrook*, we concluded that the error was not harmful, but in *Thompson* we concluded that it was and ordered a new punishment hearing.

Having found error, we must determine whether the admission of Soffar's confession

---

[171] *Texas v. Cobb*, 532 U.S. 162, 167-68 (2001).

[172] 29 S.W.3d 103, 116-19 (Tex. Crim. App. 2000) (plurality opinion).

[173] 93 S.W.3d 16, 22-27 (Tex. Crim. App. 2003).

was harmless beyond a reasonable doubt.[174]  Soffar contends that the admission of his confession to prove future dangerousness was harmful because it was the most serious extraneous offense and it formed a significant part of the State's case for death.  We disagree and hold that the error was harmless.

First, there was other convincing evidence establishing Soffar as Knight's assailant.[175] Knight testified that she identified him at his trial in 1981.  She also testified about the assault, which occurred in September 1979.  Knight noticed Soffar standing beside her car when she exited a laundromat.  He asked her for a ride.   Knight agreed, even though she felt uneasy. Threatening Knight with a knife, Soffar ordered her to get out of the car and take her clothes off.  He told her that he had killed three other women and that she would be the fourth.  He then forced Knight to have vaginal intercourse while repeatedly stabbing the knife in the ground above her head.  When he finished, Soffar walked off saying that he had done some bad things in the past, but he had never "raped no chick before."  Knight got back in her car and went to the police station.  Later, Knight's husband noticed that his twelve-string guitar, which had been in the backseat of Knight's car, was missing.

Pamela Foley testified that she bought a twelve-string guitar from Soffar in September 1979 for her boyfriend.  She was later contacted by police about the guitar.  Ultimately, her

---

[174]   Ex. R. App. P. 44.2(a).

[175]  *See Mosley v. State*, 983 S.W.2d 249, 258 (Tex. Crim. App. 1998) (We have held in "the erroneous admission of evidence context[,] that the admission of other similar evidence can render error harmless.").

former boyfriend gave the guitar to police.  James Ougsgurger, Knight's husband at the time of the assault, testified about owning the guitar and identified it in court.

Second, the remaining evidence of future dangerousness was strong.  Soffar's behavioral problems began early in his childhood, and his past is replete with examples of his inability to control his improper and violent behavior.  On numerous occasions, he acted violently toward family, friends, law-enforcement officers, and animals.

Soffar was adopted as a baby by Zelda and George Soffar.  Zelda testified that Soffar began to have behavioral problems in 1961 when he was six. In 1968, Zelda and George committed Soffar to the Austin State Hospital after he was bitten by a coral snake and had taken medication that "set him off."  Soffar's juvenile probation officer testified that Soffar entered the system in 1968 because he had run away from home and his parents were unable to control him.  Soffar remained at the Austin State Hospital for almost three years, from 1968 to 1970, though he would frequently run off.

In 1970, Soffar was returned to his parents.  He was treated by two child psychiatrists because Zelda observed Soffar "liking to inflict pain on animals and people."   When Soffar was in eighth grade, Zelda and George took him out of school because Soffar was going to be kicked out; he was unable to control his temper with the kids in school.

Soffar was referred to the Galveston Juvenile Probation Office a second time after he assaulted a minor in 1970.  After Soffar committed a few more "minor" offenses, he was brought to the attention of the juvenile court, and in August 1971, he was adjudicated a

delinquent. He was placed on probation, assigned a probation officer, and was sent to live at Boy's Country—a "dormitory type arrangement[] to give the kids kind of a family atmosphere to where they would have access to farm animals and outside activities and so forth." Soffar's probation officer testified that despite being placed in an "environment with consistency, structure and discipline," Soffar was unsuccessful at controlling his behavior. He was expelled from Boy's Country in 1972 for violating the terms of his probation. The probation office then placed Soffar with the Gulf Coast Trade School. He was there from 1972 to 1973.

In 1973, when Soffar was seventeen and about to age-out of the juvenile system, probation officials tried to get him more help through vocational training with the Vocational Rehabilitation Center; Soffar was never placed on a job site and was later terminated from the agency.

Zelda stated that Soffar broke his sister's arm because of a "sibling rivalry;" the two fought "all the time." She also testified that Soffar had beat a horse until it bled because the horse refused to do his "bidding." She also testified that he abused people "[i]n a fit of temper." Usually, he would swing at things or throw bottles at walls or inanimate objects. Once when he lost his temper, Soffar chased Zelda around the house with a butcher knife, and she called the police. He also struck George once.

In 1977, Zelda flagged down a police officer outside her home because Soffar was tearing up the house. When the officer attempted to arrest a friend of Soffar's for public intoxication, Soffar grabbed the officer's hand in an attempt to help free his friend. In the

process, Soffar burnt the officer's hand with a cigarette. Soffar was then arrested and charged with aggravated assault.

In 1978, Soffar escaped from the custody of a law-enforcement official who was in the process of citing Soffar for traffic violations. Soffar was later convicted of resisting arrest.

In 1979, Soffar pointed a pistol at police officers, stating that he was "going to kill them son of bitches." Soffar was arrested for reckless conduct.

In 1980, Soffar lived at his parent's house with his girlfriend, Katherine Moll, who was seventeen at the time. She testified that Soffar had a Doberman. Soffar had the dog's ears cut, and the dog would paw at the tape on his ears and pull it off. Soffar took the dog out back and shot him. Soffar told Moll that "he couldn't afford to keep bringing him back to have his ears fixed again and taped up." Later, Soffar took Moll out into the woods in the back of her parent's house and held a .38 caliber snub-nose pistol to her head. He then told her that he would shoot and kill her and bury her in the woods with five other women he had buried out there. A neighbor heard Moll crying and called police. When Soffar and Moll came out of the woods, the police were there. Soffar ordered Moll to take the gun and put it in her pocket. When the police asked for the gun, Moll gave it to them. Soffar was charged with terroristic threats.

The State's punishment evidence also included Soffar's prior convictions. In 1975, Soffar was convicted of resisting arrest, possession of marijuana, and enticing a child. In 1976, he was convicted of theft, burglary of a habitation with intent to commit theft, and

burglary of a coin-operated machine. In 1978, he was convicted of possession of marijuana. And in 1980, he was convicted of reckless conduct.

Finally, the evidence showed that Soffar was unable to comply with prison rules while incarcerated. In 1982, he possessed contraband. In 1984, he threatened an officer, failed to obey orders, and possessed a weapon. He was also cited with a level-one escape. In 1985, while incarcerated, Soffar threw urine on a correctional officer. The officer believed Soffar did this because Soffar was angry that the officer turned him in for having contraband in his cell. Also in 1985, Soffar possessed a weapon, damaged or destroyed property, and failed to obey orders. In 1987, Soffar was cited for being out of place. In 1990, he was cited with damaging or destroying property and threatening to inflict harm on another inmate. In 1992, he possessed contraband. In 1995, he possessed marijuana and tobacco. In 1996, he threatened to inflict harm on an officer. In 1997, he was cited for using an intoxicating inhalant. In 1998, he was cited for possessing marijuana and tobacco.

With the foregoing evidence in mind, including evidence of the current offense—for which Soffar showed no remorse when confessing to Bryant and Cass—we hold that, beyond a reasonable doubt, Soffar's sexual-assault confession did not influence the jury's determination that Soffar is a future danger. Therefore, we overrule Soffar's point of error twenty-seven (a).

In point of error twenty-seven (b), Soffar argues Bockel's interrogation violated his Fifth Amendment right against self-incrimination because he was not informed that any

confession could be used against him during the sentencing phase of his capital trial. Soffar

incorrectly relies on *Estelle v. Smith* for the requirement that *Miranda* warnings must inform

the suspect when statements can be used in the penalty phase of a capital trial.[176] In that case,

the United States Supreme Court found error because the suspect did not receive any *Miranda*

warnings at all, not because the warnings did not adequately address the potential for the

statements to be used during capital sentencing.[177] As stated above, Detective Bockel

informed Soffar of his rights under *Miranda*, and the record reveals that Soffar knowingly and

voluntarily waived his *Miranda* rights. Soffar provides no authority to support his contention

that the warnings should include a specific capital-punishment warning. Further, the warnings

given were broad enough to inform Soffar that any statements could have been used against

at his capital-murder trial.[178] Point twenty-seven (b) is overruled.

### Knight's In-Court Identification

In point of error twenty-eight, Soffar alleges that the trial judge erred in permitting

Knight to testify about her 1981 in-court identification of Soffar as her assailant because it

was tainted by suggestive governmental tactics. Soffar contends that Knight was

---

[176] 451 U.S. 454, 467 (1981).

[177] *Id*. at 469.

[178] *See Miranda*, 384 U.S. at 469 ("The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. This warning is needed in order to make him aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege.").

"undoubtedly influenced by the State showing Soffar's image to her twice before the 1981 trial and by seeing Soffar brought into the courtroom by a guard [at his 1981 trial]."

The United States Supreme Court, recognizing that pre-trial identification procedures can sometimes be overly suggestive, has formulated a two-step analysis to be used when evaluating the admissibility of an in-court identification: (1) whether the out-of-court identification procedure was impermissibly suggestive; and (2) whether that suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification.[179]

Impermissible suggestiveness may result from an individual act or from the cumulative effect of multiple acts.[180] For example, it occurs when police point out the suspect, suggest that the suspect's photo is included in an array, or suggest that the suspect is present in a lineup.[181] Also, the photo array or line-up itself may be impermissibly suggestive if the suspect is the only individual matching the description provided by the witness.[182] Viewing the totality of the circumstances, any impermissibly suggestive procedure should be evaluated against the following non-exclusive list of factors to assess the reliability of the identification: (1) the witness's opportunity to observe the defendant during the crime; (2) the witness's degree of attention during that observation; (3) the accuracy of the witness's prior physical

---

[179] *Conner v. State*, 67 S.W.3d 192, 200 (Tex. Crim. App. 2001) (citing *Simmons v. United States*, 390 U.S. 377, 384 (1968)).

[180] *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995).

[181] *Id.*

[182] *Id.*

description; (4) the witness's degree of certainty when viewing a defendant; (5) and the amount of time between the offense and the identification of the accused.[183] The appellant bears the burden to establish "by clear and convincing evidence that the in-court identification is unreliable."[184]

While investigating the sexual-assault offense, approximately a month after the offense, Bockel presented Knight with a photo spread that contained a photo of Soffar. Before showing her the photos, Bockel told her that her assailant "may or may not be in [the array]." Knight stated that when Bockel presented her with the photo spread, it was her understanding that the person who assaulted her would be present. Bockel had told her that they may have caught her assailant and wanted her look at the spread to see if she could identify him. Knight identified Soffar and another man as the man who possibly assaulted her. Regarding Soffar, Knight said he "looked like the man but his face . . . was a little thinner than the one who raped her." She "was not comfortable saying for sure that was him." She also told Bockel that her assailant's hair seemed longer. She did not tell Bockel that her assailant was missing his two front teeth even though Soffar was missing his two front teeth.

A few days later Bockel assembled a live line-up that included Soffar. The line-up was conducted in the presence of Soffar's counsel, and Bockel instructed Knight that she was not required to pick anyone and that her assailant might or might not be in the array. Knight was

---

[183] *Loserth v. State*, 963 S.W.2d 770, 772 (Tex. Crim App. 1998) (citing *Neil v. Biggers*, 409 U.S. 188, 199 (1972)).

[184] *Cooks v. State*, 844 S.W.2d 697, 731 (Tex. Crim. App. 1992).

also given written instructions that stated that she "should not guess or attempt to conclude that the person who committed the crime is present. Remember it is just as important to clear innocent persons from suspicions as it is to identify guilty parties." Knight tentatively identified Soffar as her assailant, but she could not "swear to it."

At Soffar's 1981 trial, Knight identified Soffar as her assailant when a guard escorted Soffar into the courtroom. She stated that she recognized him as soon as he walked in. She had no doubt that Soffar assaulted her and she was basing her identification on seeing him on the night she was assaulted. "[I]n court and also at the time of the assault he had short hair and no facial hair and was heavier. In the photo spread he had long hair, had lost a lot of weight and had facial hair and I believe just the difference of seeing him in person versus a photo." Knight also stated that there was nothing about the courtroom atmosphere or seeing Soffar with a guard that caused her to identify Soffar as her attacker. She "had absolutely no doubt when [she] saw him."

In this case, Soffar does not contest the validity of either the photo array or the line-up;[185] he cites only the cumulative effect of the repeated exposure. While the record shows that Knight picked Soffar out of the photo array and the live line-up, in each instance her identification was only tentative. Her tentative identification militates against a finding that the pretrial procedures were overly suggestive. Furthermore, Knight testified that she based her in-court identification on her observation of Soffar during the attack, not on the photo

---

[185] *See Williams v. State*, 937 S.W.2d 479, 488 (Tex. Crim. App. 1996).

spread or the line-up.

Next, the law regarding suggestive identification procedures applies to procedures that take place out of court. Because Knight's 1981 identification was done in court, that her identification might have been tainted by seeing Soffar with a guard does not affect its admissibility, only its weight—an issue to be challenged by the defense through cross-examination. Additionally, Soffar presents no evidence that he was brought into the courtroom under uniquely prejudicial circumstances, and Knight steadfastly maintained that she based her in-court identification solely on her memories from the assault. Viewing the facts in the light most favorable to the trial judge's decision to deny Soffar's request to suppress Knight's 1981 in-court identification,[186] we conclude that Soffar has failed to establish that either of the out-of-court identification procedures was impermissibly suggestive so as to deny him due process of law. Accordingly, we overrule point of error twenty-eight.

### Admission of Juvenile Conduct

In point of error twenty-nine, Soffar argues that the trial judge violated his constitutional right to a reliable capital-sentencing hearing and to due process of law by admitting evidence regarding his prior juvenile conduct. Soffar attempts to extend the holding in *Roper v. Simmons*, which prohibits the execution of juvenile offenders,[187] to support his claim that evidence of prior juvenile offenses cannot be introduced during the sentencing

---

[186] *Loserth*, 963 S.W.2d at 773-74.

[187] 543 U.S. 551, 578-79 (2005).

phase of a capital trial. Soffar did not object on this basis when the juvenile-misconduct evidence was offered by the State and admitted into evidence by the trial judge; he objected on this basis only when the trial judge and the parties prepared the punishment charge. Soffar's objection was untimely and preserved nothing for our review.[188] We therefore overrule point of error twenty-nine.

## Admission of Aggravating Conduct

In his thirtieth point of error, Soffar complains that his rights to a reliable sentencing hearing and to due process of law were violated by the admission of allegedly aggravating conduct that was the result of his mitigating mental illness (i.e., organic brain syndrome). Soffar contends that all the extraneous offenses and bad acts that he committed were due to mental illness; therefore, the State should not have been permitted to use that evidence in pursuing a death sentence. We conclude that Soffar failed to lodge a timely objection to this evidence. Soffar objected on this basis only when the trial judge and the parties were discussing the punishment charge. Because Soffar did not object on the basis he complains about on appeal when the extraneous and bad-act evidence was offered or admitted, he failed to preserve this ground for review.[189] We therefore overrule Soffar's thirtieth point of error.

## Admission of Prior Misdemeanor Convictions

Soffar alleges in his thirty-first point of error that he was denied a fair sentencing trial

---

[188] T EX. R. APP. P. 33.1.

[189] *Id.*

due to the admission of decades-old unconstitutional convictions that were irrelevant to sentencing. Specifically, Soffar complains about the admission of his 1976 convictions for burglary of a coin-operated machine and his 1980 conviction for reckless conduct. According to Soffar, the State failed to show that, when pleading guilty to these offenses, Soffar waived his right to confront witnesses and his right against self-incrimination. Soffar also alleges that the State also failed to show that Soffar knowingly and voluntarily waived his right to a jury trial when entering his guilty pleas. Our review of the record reveals that Soffar failed to object on these bases at trial. Soffar claimed only that the trial judge was required to find that Soffar was the perpetrator beyond a reasonable doubt. Thus, he failed to preserve this ground for our review.[190] Point of error thirty-one is overruled.

### Summation Misconduct

In his thirty-second point of error, Soffar alleges that the State violated his constitutional rights because of several acts of misconduct during its sentencing-phase summation.

Soffar first contends that the State mentioned facts outside the record when it argued that Soffar assaulted two neighborhood children on October 18, 1970. We have recognized four acceptable categories of jury argument: (1) summary of the evidence; (2) reasonable deduction from the evidence; (3) in response to argument of opposing counsel; and (4) plea for law enforcement."[191]

---

[190] T EX. R. APP. P. 33.1.

[191] *See Borjan v. State*, 787 S.W.2d 53, 55 (Tex. Crim. App. 1990).

Dr. Susan Stone, a defense witness, was asked on cross-examination whether one of the reasons that Soffar was sent to Austin State Hospital was because of what "he had done in the neighborhood regarding . . . the 2 little girls that he jumped on in the neighborhood." Dr. Stone responded, stating, "I don't remember the words jumped on but I remember there were some issues in the neighborhood, yes." Based on Dr. Stone's testimony, the State's argument was a reasonable deduction from the evidence. While Dr. Stone did not recall that Soffar had "jumped on" two neighborhood girls, her answer gave the impression that Soffar had indeed caused some type of physical harm to the girls. Therefore, the State's argument was not outside the record.[192]

Next, Soffar complains that the State repeatedly compared the value of the victims' lives to Soffar's life. We assume that each of the complained-of instances is properly preserved and conclude that Soffar has not shown that the arguments were improper; the State did not compare the worth of the victims to other members of society.[193]

Soffar also alleges that the State personally attacked defense counsel's attempt to present mitigating evidence. Soffar points to the following remark: "And you know what all the things that [defense counsel] says about his background, all the things that she says and she

---

[192] *See Cantu v. State*, 842 S.W.2d 667, 690 (Tex. Crim. App. 1992) (counsel is generally afforded wide latitude in drawing inferences from the record, as long as such inferences are reasonable and offered in good faith).

[193] *See Jackson v. State*, 33 S.W.3d 828, 834 (Tex. Crim. App. 2000) (observing that *Payne v. Tennessee* only "discourages 'measuring the worth of the victim compared to other members of society.'").

wishes were so true[;] just because she says it doesn't make it true."  This statement, according to Soffar, implied that defense counsel was misrepresenting the evidence.  Soffar did not object to this statement at trial.  He argues, however, that he did not waive error because the statement fits within the exception to the waiver rule, which provides that error is not waived for failure to object "for cases in which the prosecutor's argument is so egregious that no instruction to disregard could possibly cure the harm."[194]  Soffar is incorrect.  The exception to the waiver rule, as observed in *Willis v. State*, was overruled in our decision in *Cockrell v. State*.[195] Therefore, he has forfeited his right to initiate this complaint on appeal.

Finally, Soffar contends that the State misstated the law when the prosecutor told the jury that whether Soffar's mental issues constituted mitigating evidence was an open question. Soffar contends that his record of mental illness is inherently mitigating.  Soffar did not object to the State's argument; therefore, we conclude that Soffar forfeited his complaint by failing to object at trial.[196]

Based on the foregoing, we overrule Soffar's thirty-second point of error.

### Challenges to Lethal Injection Protocol

In point of error thirty-three, Soffar challenges Texas' lethal-injection protocol.  In sub-claims (a) through (c), he contends that the protocol violates the United States and Texas

---

[194] *Willis v. State*, 785 S.W.2d 378, 385 (Tex. Crim. App. 1989), *overruled in part by Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996).

[195] *Cockrell*, 933 S.W.2d at 89.

[196] *Id.*

Constitutions and international law. In sub-claim (d), he complains about the trial judge's failure to hold an evidentiary hearing on his pretrial motion challenging the protocol. In sub-claim (e), he contends that the trial judge violated his Eighth Amendment rights by preventing him from litigating his claim before the jury at sentencing.

Soffar's current challenges to Texas' execution protocol are not ripe for review.[197] We overrule points of error (a) through (c). Further, because his claims are not ripe for review now, they were not ripe for review at the time of his trial. Therefore, the trial judge did not err in overruling the complaints that are the subject of sub-claims (d) and (e). Points of error thirty-three (d) and (e) are overruled.

## Cumulative Error

In point of error twenty-one, Soffar claims that he is entitled to reversal "due to the cumulative harm of the errors." We have recognized that a number of errors may be found harmful in their cumulative effect; however, because we have only found one error at the guilt phase and one error at the punishment phase, we cannot say that there is a cumulative effect.[198] Point of error twenty-one is overruled.

## Conclusion

Because we have overruled Soffar's thirty-three points of error, we affirm the trial court's judgment.

---

[197] *Gallo v. State*, 239 S.W.3d 757, 780 (Tex. Crim. App. 2007).

[198] *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999); *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000).

DATE DELIVERED: November 18, 2009
DO NOT PUBLISH